## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARLOS CASTILLO, et al.,      )     Case No. 07-cv-1195 (CKK)
                        )
        Plaintiffs,     )
                        )
v.                    )
                        )
P & R ENTERPRISES, INC.,    )
                        )
        Defendant.    )
                        )

## PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR NOTICE TO SIMILARY-SITUATED EMPLOYEES AND REQUEST FOR ORAL ARGUMENT

## I.    INTRODUCTION

The standard for conditionally certifying an FLSA overtime claim for purposes of notifying potential class members of the collective action is a lenient one. Plaintiffs need only provide a "modest factual showing" that they and the potential class members were "together the victims of a single decision, policy or plan." *Hunter v. Sprint Corp.*, 346 F.Supp.2d 113, 117 (D.D.C. 2004). The evidence before the Court meets that standard: it shows that Plaintiffs and the potential class members work under a highly-centralized management structure that applies the same employment policies, including time keeping and payroll practices, to all non-exempt janitorial employees in the proposed class. Conditional certification of this collective action in no way prejudices Defendant, as it remains free to move to decertify the class if discovery shows Plaintiffs and the class members are not similarly situated. By contrast, the failure to provide notice of the collective action unduly prejudices potential class members, as they have no opportunity to

join their claims with those of Plaintiffs and avoid the statute of limitations running against them.

Defendant nonetheless opposes conditional certification, arguing that because its employees work at so many distinct job sites, they can never be similarly situated for purposes of a collective action. This argument has been rejected by a number of courts. The non-exempt janitorial employees Plaintiffs seek to include in their collective action all perform the same type of work under the same centralized management structure and according to the same centralized employment policies. It would completely obliterate the purpose of a collective action by limiting collective actions to a particular job site. The Court is respectfully urged to grant Plaintiffs' motion for notice.

## II.  ARGUMENT

### A.  The Standard To Be Applied Is Lenient.

Defendant argues that a stringent standard of proof applies to the question of conditional certification. In truth, the weight of authority applies a fairly lenient standard that Plaintiffs have clearly met.

The vast majority of courts—including those in this District—have applied a two-stage approach to conditionally certifying a class for purposing of providing notice of the collective action and the right to "opt in" under Section 216(b) of the FLSA. *Hunter*, 346 F.Supp.2d at 117; *Chase v. AIMCO Properties, L.P.*, 374 F.Supp.2d 196, 200-01 (D.D.C. 2005). *See also Adams v. Inter-Con Sec. Systems, Inc.*, 242 F.R.D. 530, 536 (N.D.Cal. 2007); *White v. MPW Industrial Services, Inc.*, 236 F.R.D. 363, 366 (E.D.Tenn. 2006); *Davis v. NovaStar Mortg., Inc.*, 408 F.Supp.2d 811, 815 (W.D.Mo. 2005).

At the outset plaintiffs must make a "'modest factual showing'" that they are similarly situated to potential class members. *Hunter,* 346 F.Supp.2d at 117, *quoting Flores v. Lifeway Foods, Inc.*, 289 F.Supp.2d 1042, 1045 (N.D.Ill. 2003). *Accord Chase v. AIMCO Properties, L.P.*, 374 F.Supp.2d 196, 199 (D.D.C. 2005). If a court finds that the "similarly situated" inquiry is met, the class is conditionally certified, the members of the class are given notice of the collective action and an opportunity to "opt in" to the case, and the case proceeds as a representative action through discovery. *Hunter*, 346 F.Supp.2d at 117; *White*, 236 F.R.D. at 366. Once discovery is complete, defendant may move to decertify the class in light of the evidence in the record, and at that point a more stringent analysis applies, in which a court "determines whether the class members are indeed similarly situated." *Chase,* 374 F.Supp.2d at 199.

Because conditional certification is not binding, instead merely facilitating notice being given to potential class members of the right to "opt in" to the collective action, courts have noted that "conditional certification at the notice stage requires 'nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan.'" *Davis,* 408 F.Supp.2d at 815 (cit. om.); *Adams,* 242 F.R.D. at 536. As Judge Robertson has noted, there is "little prejudice" to granting conditional certification, even where the record evidence does not fully support plaintiff's theories that the FLSA has been violated:

> Even if a collective action is not ultimately certified, the process of allowing individual AIMCO workers to lodge their claims in a forum where they can be recognized, evaluated, and possibly settled, is consistent with the policy choice Congress made when it created the FLSA right of action.

*Chase*, 374 F.Supp.2d at 201.

The "similarly situated" inquiry uses a lenient standard. *White,* 236 F.R.D. at 366-67 (describing the standard variously as "factual nexus" between plaintiff's situation and those of other employees, "some rudimentary showing of commonality," a "threshold showing," and a "colorable basis" for plaintiff's claim that the plaintiffs are similarly situated). "'A court may deny a plaintiff's right to proceed collectively only if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy or practice.'" *Ryan v. Staff Care, Inc.*, 497 F.Supp.2d 820, 825 (N.D.Tex. 2007) (*cit. om.*) Plaintiffs need not produce evidence sufficient to grant summary judgment, nor need the plaintiff's affidavits meet the standards of F.R.C.P. 56(e). *White*, 236 F.R.D. at 368. "To require more at this stage of litigation would defeat the purpose of the two-stage analysis." *Id.*

### B.    Plaintiffs Have Met The Lenient Standard Required.

In opposing Plaintiffs' motion for notice to the class, Defendant misunderstands the scope of the notice Plaintiffs seek. Plaintiffs' FLSA overtime claim is brought on behalf of *all* of Defendant's non-exempt employees who perform janitorial services, not just those who worked or are working in the District of Columbia. Plaintiffs seek to provide notice of the FLSA overtime claim to *all* of Defendant's non-exempt employees throughout the Metro-DC area, including those who worked or are working in Maryland and Virginia. Plaintiffs have made the requisite "modest factual showing" that they are similarly situated to the potential class. *See* Notice, attached as Appendix A, at Section 2 (The FLSA claims

"includes employees who cleaned buildings in Maryland and Virginia, as well as in the District of Columbia.")

Defendant maintains a highly-centralized management structure and employment policies that apply to all employees in the potential class. Defendant has one employee handbook covering *all* of its employees, including those in Virginia and Maryland. (Sanchez Decl., ¶ 8, Ex. B; Castillo Decl., ¶ 2, Ex. A, at p. 9, describing policies for payment of wages upon termination for employees in Maryland, Virginia and the District of Columbia.)[1] The 40-page handbook contains detailed, uniform employment policies and practices that apply to all non-exempt janitorial employees, regardless of their individual job duties and regardless of which building they work in. These uniform employment practices include use of time cards to track hours worked (p. 7); payroll periods (p. 9); and overtime (p. 10). The handbook was last revised in January 2001, indicating that these uniform policies are long-standing. Indeed, although Plaintiff Castillo worked at several different buildings over the course of his 17-year employment with Defendant, he received only one

---

[1]    Defendant objected to Plaintiffs' failure to submit affidavits to support their motion for notice, even though Plaintiffs drafted their Complaint in full compliance with F.R.C.P. 11(b)(3)'s requirement that all factual contentions have evidentiary support, and courts have granted conditional certification solely on the basis of allegations in a complaint. *E.g., Allen v. Marshall Field & Co.*, 93 F.R.D. 438, 443 (N.D.Ill. 1982). Nevertheless, Plaintiffs have now supported those allegations with sworn declarations. *See* Declaration Of Carlos Castillo In Support Of Motion For Notice To Similarly-Situated Employees and Declaration of Joni S. Jacobs In Support Of Motion For Notice To Similarly-Situated Employees, filed and served herewith. Plaintiffs do not object to Defendant having a reasonable period of time to submit a response to the declarations. However, any factual disputes Defendant may seek to create in its response is not dispositive of the motion, as courts do not make credibility determinations at the notice stage. *Davis*, 408 F.Supp.2d at 816.

handbook, and the employment policies were the same at each building. (Castillo Decl., ¶ 2.)

Additionally, Defendant has a highly-centralized management structure that supervises the work of all non-exempt janitorial employees. There are no divisions with Defendant's corporate structure with separate management structures or management policies—there is one centralized management structure, with President Carlos Sanchez at the top, and one centralized payroll department. A Project Manager oversees the non-exempt cleaner employees at each building; the Project Manager reports to an Area Manager who oversees several buildings; and the Area Manager reports to President Sanchez, who remains ultimately responsible for the supervision of Defendant's employees. (Sanchez Decl., ¶ 7; Castillo Decl., ¶ 3.) This management structure is the same no matter which building employees work in. (Castillo Decl., ¶¶ 3, 4.) With respect to payroll, the Project Manager collects the time cards and submits them to an Area Manager, who submits them to Defendant's centralized payroll department for payment. (Castillo Decl., ¶ 9.) This practice applies regardless of the building employees work in. (Castillo Decl., ¶ 9.)

Defendant's overtime policies and practices are company-wide, not personal to Plaintiffs or the building they work in. President Sanchez told Plaintiff Castillo that Defendant did not pay overtime to *anyone*. (Castillo Decl., ¶ 10.) This is an admission by the highest-level manager of a company-wide policy, practice or scheme to violate the FLSA.

Defendant's own time records demonstrate that what Sanchez said is true. Job Time Sheets show that Plaintiffs were *scheduled* to work more than 40 hours in a workweek

6

(Jacobs Decl., ¶¶ 3, 5-6, Ex. A), yet they were not paid overtime, even when they actually worked more hours than they were scheduled to work. (Jacobs Decl., ¶¶ 4, 7-8, Exs. B and C.) Indeed, Plaintiffs' paystubs show they were paid straight-time on as many as 121 and 136 hours in a payroll period (Jacobs Decl., ¶¶ 4, 7-8, Exs. B and C), even though it is impossible that Plaintiffs worked that many hours in a payroll period without working overtime. The mere fact that Defendant's central payroll department paid only straight-time on what obviously had to be overtime hours suggests a company-wide policy of not paying overtime even when it is clearly due.

Employees also were required to perform work on their breaks—with the full knowledge of their supervisors—yet they were not paid for this time. (Castillo Decl., ¶ 7; Complaint, ¶ 19.) Some employees work part-time shifts at two different buildings, and although their combined hours total more than 40 in a workweek, they are not paid overtime. (Castillo Decl., ¶ 8; Complaint, ¶ 12.)

In short, Plaintiffs have provided a "modest factual showing" that they and potential class members "'together were victims of a common policy or plan that violated the law.'" *Chase*, 374 F.Supp.2d at 200, *quoting Hoffman v. Sbarro, Inc.*, 982 F.Supp. 249, 261 (S.D.N.Y. 1997). Conditional certification is therefore appropriate, and the notice Plaintiffs request should be granted.

### C.    Defendant's Arguments To The Contrary Have Been Rejected By Other Courts And Should Be Rejected Here.

Defendant contends that Plaintiffs are not similarly situated to potential class members (and indeed, there can be no class) because not all employees perform the same

exact job duties in the same building. This absurd argument has been rejected by several courts. A plaintiff seeking conditional certification need not show that the positions within the class are identical, only that they are similar. *Ryan*, 242 F.R.D. at 537. Defendant's job titles for non-exempt employees in the potential class indicate that their positions and the work they perform are similar—they all perform cleaning and janitorial services. (Sanchez Decl., ¶¶2-3, listing Day Porter/Matron, Floor Care Workers, Light Duty Cleaner, Restroom Cleaner, Vacuum Specialist, Trash Collector, Day Cleaner, Zone Cleaner, and Maid among its job classifications.) The fact that some employees clean lobbies while others clean restrooms, or that some employees run vacuum cleaners while others run floor waxers, is irrelevant. Certainly it does not mean they are not similarly situated for purposes of this motion.

Defendant's reliance on *Freeman v. Wal-Mart Stores, Inc.*, 256 F.Supp.2d 941 (W.D.Ark. 2003) is misplaced. In *Freeman*, the proposed class included *salaried* employees, and the heart of the FLSA violation was a claimed misclassification of plaintiff and other class members as exempt in order to avoid the overtime requirements. 256 F.Supp.2d at 943. Obviously, the question of whether any member of the class was misclassified as exempt depended on an analysis of his job duties, since exemption from FLSA overtime depends upon the actual job duties performed. *E.g.,* 29 U.S.C. § 213(a)(1) (exempting from the FLSA's coverage employees who work in bona fide executive, administrative or professional capacities). In the context of the specific claims raised in *Freeman*, the court held that the plaintiff had not shown that he was similarly situated to the potential class members for conditional certification because he had not shown that his

duties were comparable. *Freeman*, 256 F.Supp.2d at 945. By contrast, here Defendant *concedes* that the employees in the proposed class are all non-exempt (Sanchez Decl., ¶ 2), and thus the specific duties of individual class members are irrelevant to any question presented in the case. The proposed class consists entirely of non-exempt employees who clean commercial office and similar buildings in the Metro-DC area—positions and duties that are sufficiently similar for purposes of conditional certification.

Defendant contends that Plaintiffs can only be similarly situated to employees who work in the same building they worked in—and not any of the other buildings in which non-exempt employees do cleaning work—because individual Property Managers set the employees' schedules, review the time cards and calculate the hours worked by employees in the individual buildings. Defendant's argument flies in the face of conditional certifications granted by courts in this District and others, in situations where the number of work sites was far greater than here. *E.g., Chase*, 374 F.Supp.2d at 198, 201 (conditionally certifying a class of service technicians and managers who worked at 1500 different apartment communities across the country owned and operated by defendant); *Adams,* 242 F.R.D. at 537 (conditionally certifying a class of security guard employees who worked at more than 500 different locations in 36 different states under more than 50 different contracts between the defendant employer and its clients). Accepting Defendant's argument would render nearly meaningless the device of collective action for employees of employers with scattered work sites at which only a handful of employees work. As the *Adams* court noted, "For conditional certification, plaintiffs do not need to provide evidence that every facility relevant to the propose class maintains an illegal policy. . . . By requesting

conditional certification in order to send notices, plaintiffs are not asking the court to infer a finding of liability at all of [defendant's] other facilities." 242 F.R.D. at 537.

Defendant's argument also ignores the fact that all non-exempt janitorial employees, regardless of which building they work in, are subject to highly-centralized employment and payroll policies and practices. At best the Project Managers are low-level supervisors who merely apply and enforce the centralized employment policies set forth in the Defendant's employee handbook, without exercising any discretion or independent judgment. While individual Project Managers may collect time cards and calculate the hours to be paid for employees in a particular building, they submit this data to Area Managers who oversee several buildings, and the Area Managers then submit the data to a centralized payroll department. Defendant asks the Court to believe that no one in Defendant's centralized payroll department checks the hours reported to see if overtime is due, even when, as shown above, the number of hours reported in a payroll period obviously exceed more than 40 in a workweek. Common sense refutes Defendant's argument.

Defendant tries to avoid conditional certification by arguing that some of its buildings are union and others are not. This is wholly irrelevant. A collective bargaining agreement generally cannot waive or modify the FLSA's mandatory provisions. *E.g.,* *Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 706 (1945). Whether the SEIU agreed to organize Defendant's employees on a building-by-building basis has absolutely no bearing on the question before the Court—that is, whether for purposes of the Section 216(b) notice sought, Plaintiffs are similarly situated to other non-exempt employees who perform similar work in other buildings and who are subject to the same payroll policies and practices.

Defendant does not argue, let alone show, that the collective bargaining agreements modified the management structure overseeing unionized employees or the payroll policies and practices applicable to them. To the contrary, both the collective bargaining agreement and Defendant's employment handbook require the payment of overtime and use the same definition of full-time workers, (Jacobs Decl., ¶ 9, Ex. D, Art. 3 §1, 4 §1), and the collective bargaining agreement does not address, let alone alter, Defendant's payroll periods, use of time clocks, management structure or payroll practices. It is irrelevant that the amount and length of breaks may vary among unionized and non-unionized employees—what is relevant is whether employees worked on their unpaid breaks without pay, as alleged by Plaintiffs, and nothing in the collective bargaining agreement excuses Defendant from its obligations under the FLSA in that regard.

Defendant also contends that most of its employees are part-time, could not have worked overtime, and thus have no claim for relief similar to that of the named Plaintiffs. Yet Defendant concedes that at least 191 current employees in the District of Columbia are full-time employees, (Sanchez Decl., ¶6), and this does not even include full-time employees in Virginia and Maryland. Defendant apparently concedes that full-time employees are included in the potential class, and thus there is a sufficient number to make a collective action appropriate here. More to the point, Defendant's argument injects a red-herring into the case, because Plaintiffs do not seek to include "part-time" employees in the proposed class. As made clear in Plaintiffs' motion and the proposed notice, the proposed class includes only non-exempt janitorial employees who were not paid overtime for more than 40 hours worked in a workweek. It is conceivable that an employee, even though

classified as part-time, actually worked more than 40 hours in a workweek without being paid overtime, in which case they would be in the proposed class. This scenario is not far-fetched: Defendant's employee handbook defines a part-time employee as anyone who is scheduled to work less than 35 hours a week (Castillo Decl., Ex. A, p. 4), and the evidence shows that some employees work part-time shifts at two buildings and may work more than 40 hours in a workweek. Thus, all non-exempt janitorial employees, regardless of whether Defendant classified them as full-time or part-time, should receive the notice. At this early stage of the litigation, Plaintiffs should not be required to take Defendant's word for it that no employee classified as "part-time" could ever have worked overtime, such that they should be deprived of receiving the notice and having the right to opt in. There certainly will be sufficient time in discovery to weed out the claims of employees who may opt in despite not meeting the requirements of the class. Defendant's own time records may well be sufficient to weed out these employees without the need for any individualized discovery from them.

Finally, Defendant argues that Plaintiffs have not sufficiently demonstrated a common policy or plan that violated the FLSA. Defendant's argument is based solely on its conflicting contentions that either it did not violate the FLSA at all, or if it did, the violations occurred only on a building-by-building basis. As explained above, Plaintiffs have alleged and shown a company-wide policy against paying overtime to anyone, including employees who worked while on unpaid breaks, who worked more than 40 hours in a workweek, and who worked two different shifts at two different buildings. (Compl., ¶¶ 12, 14, 18-19; Castillo Decl., ¶¶ 6-8.) These practices applied regardless of the building in

which employees worked—they were part and parcel of the supervisors applying uniform employment policies and payroll practices. Defendant will have the opportunity at trial to disprove Plaintiffs' allegations, but the mere fact that it disputes them does not provide a legitimate basis on which to deny conditional certification here. On a motion for Section 216(b) notice, the Court should not make credibility determinations. *Davis*, 408 F.Supp.2d at 816.

### D.    The Attached Notice Is Appropriate.

Plaintiffs concede that potential class members should be put on notice of the potential that they may in liability for payment of costs if Defendant prevails, and have modified the notice accordingly (attached as Appendix A). Defendant opposes Plaintiff's proposed notice on several additional grounds, however, and asks that the following additional modifications be made:

--    Defendant should send the notice out, rather than being ordered to provide names and address for Plaintiffs to do it;

--    The notice should give potential class members more information about Defendant's defenses to the allegations;

--    The notice should inform potential class members of their right to select their own counsel;

--    The notice should not ask potential class members to keep Plaintiffs' counsel informed of changes in their addresses;

--    The notice should not inform potential class members of their right to be free from retaliation for joining the lawsuit;

--     The notice should only give potential class members 30 days to opt in. None of these modifications has merit.

In addition to the mailing, Plaintiffs also request that the Court order Defendant to post the notice in each building in which non-exempt employees perform cleaning work. The posting is requested to ensure that current employees, who may not have kept their home address up to date with Defendant, have a chance to see the notice, and because potential plaintiffs may be unaware of the significance of a notice they receive in the mail and may throw it away. Other courts have approved the posting sought here. *Adams*, 242 F.R.D. at 541-42; *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 493 (E.D.Cal. 2006), *Johnson v. Am. Airlines, Inc.*, 531 F.Supp. 957, 961 (N.D.Tex. 1982). Defendant has not opposed this request, and it concedes that it maintains a place to post such a notice in each building where its employees perform cleaning work. (Answer to Compl., ¶ 16.) Plaintiffs respectfully request that the Court grant the posting sought here.

With respect to the mailing, Defendant has provided no ground for refusing to supply contact information for potential class members, other than that it "unnecessarily impinges on the privacy interests of [Defendant's] current and former employees." (Opp. at 16.) The United States Supreme Court expressly authorized production of this type of information for notice purposes. *Hoffman-La Rouche v. Sperling*, 493 U.S. 165, 170 (1989). This obviously undercuts any privacy concerns Defendant may have. *See also Adams*, 242 F.R.D. at 539-40 (rejecting privacy argument in ordering defendant to provide contact information for Section 216(b) notice). It is common for courts to order a defendant to provide contact information to mail the notice. *Hunter*, 346 F.Supp.2d at 121 (ordering

defendant to provide contact information); *Belcher*, 927 F.Supp. at 252 (same); *Davis*, 408 F.Supp.2d at 819 (same). Plaintiffs respectfully request that the Court do so here. While Plaintiffs appreciate Defendant's offer to mail the notice, they would prefer sending the notice themselves, rather than relying upon the word of a Defendant hostile to the whole idea of sending the notice that it was, in fact, was timely sent to the last-known address of all potential class members.

Defendant contends that a fuller explanation of the potential plaintiff's discovery obligations and Defendant's defenses to the allegations should be included. However, the modifications Defendant seeks are likely to increase class members' confusion, rather than alleviate it. Class members are likely unfamiliar with terms such as "discovery," "interrogatories" and "document requests." The language as drafted in the notice is sufficient to put potential plaintiffs on notice of what may be required of them if they join in the lawsuit. Similarly, the notice as drafted makes clear that Defendant denies any wrongdoing and denies that it is liable to any employee, and that the Court has taken a neutral stance on the allegations of the Complaint. It would not be helpful to potential class members to list each and every one of Defendant's nine affirmative defenses.

Defendant also seeks inclusion of language informing potential class members that they may select counsel of their choice to represent them.[2]  Courts have approved notices that do not include such language. *Belcher*, 927 F.Supp. at 254. The language Defendant

---

[2]     Defendant also asks the Court to order Plaintiffs' counsel to limit communications with potential class members until they have opted in. Defendant has no grounds to request such an order, since Plaintiffs' counsel have not given Defendant's counsel any reason to question their ability and willingness to comply with applicable ethics rules.

seeks to add will merely inject more confusion than clarity, and lead to an unmanageable

collective action. As the *Adams* court noted:

> There is a good reason why defendant's proposed language should not be
> included. Suggesting that a plaintiff may opt in and bring her own lawyer
> along would lead to confusion, inefficiency and cumbersome proceedings. If
> a class member wishes to have her own lawyer, she need not opt in; she can
> hire her own lawyer and proceed with her own action. Having a class action
> with numerous counsel for plaintiffs who by opting in are class members
> would make the lawsuit unwieldy, if not impracticable. Thus, the court will
> not require that the notice include an option for potential plaintiffs to choose
> their own counsel.

*Adams*, 242 F.R.D. at 541. Plaintiffs respectfully request that for all the reasons cited by the

*Adams* court, the Court make a similar ruling here. As drafted, the notice already informs

potential class members of their right to bring their own lawsuits.

Defendant objects to the inclusion of language asking that class members keep

Plaintiffs' counsel informed of changes to their addresses. Defendant has obviously

misinterpreted the intent of this language, which is obviously meant to apply to those

potential class members who decide to opt in. In any event, Defendant has provided no

justification for excluding this language. As it facilities proper and efficient management of

the collective action, it should be left in.

Defendant also objects to inclusion of language informing potential class members

of their rights against retaliation. Defendant has provided no justification for excluding this

language. Unless Defendant has some intention to retaliate against employees who receive

this notice, we see no basis for its objection. In any event, the language should be included,

as it does nothing more than inform potential class members of the law and provides contact

information for a non-profit organization that assists employees with employment rights.

Regarding the time period in which potential class members have to opt in, Plaintiffs intentionally left this section blank pending resolution of the motion, but by no means intended that the Court set an indefinite period of time for opt ins to be filed with the Court. Courts have rejected the 30-day period sought by Defendant as being too short. *Adams*, 242 F.R.D. at 542 (setting a 90-day period). Plaintiffs respectfully request that given the number of potential class members involved, 30 days is similarly too short a period of time here. Some courts have set a period of 120 days after the order granting the notice. *Hipp v. Liberty Nat'l Life Ins. Co.*, 164 F.R.D. 574 (M.D.Fla. 1996), *aff'd* 252 F.3d 1208 (11th Cir. 2001). Plaintiffs request that the Court set a period of at least 90 days after mailing of the notice for the consent forms to be filed with the Court.

**E.    The Proposed Class Period Is Appropriate.**

Plaintiffs proposed that the notice be sent to all non-exempt employees performing cleaning work for Defendant since June 2004—three years before the Complaint was filed. Plaintiffs do not intend to seek damages for any individual class member beyond the three-year statute of limitations applicable to such employee. Rather, by tying the class period to the filing of the Complaint, Plaintiffs sought to both appropriately limit the scope of the class notice while ensuring that all employees who may have a claim receive notice of the collective action.

Defendant nevertheless seeks to send the notice only to employees employed within three years prior to the date the notice is mailed. This proposal is unworkable, however, as the date of the mailing cannot be determined until the contact information is provided, and

yet the employees to whom the notice should be sent changes each day that the mailing is delayed, as another day drops off the statute of limitations period.

It makes administrative sense to set a firm date for the class period of the notice, and Plaintiffs have requested an appropriate notice period. *See, e.g., Hunter*, 346 F.Supp.2d at 122 (using March 8, 2001 date for class period even though notice was not to be submitted to court for approval until December 6, 2004); *Davis*, 408 F.Supp.2d at 819 (using June 2001 as date for class period even though notice was not to be submitted for court approval until November 17, 2005). The Court should use the class period suggested by Plaintiffs.

###     F.    Plaintiffs Respectfully Request Oral Argument On The Motion.

Given the importance of the issues to a relatively large group of employees who otherwise may not have the resources to pursue FLSA violations on their own, Plaintiffs respectfully request that the Court hear oral argument on their motion at the Court's earliest opportunity, so that Plaintiffs may fully explain the issues raised on their motion and Defendant's opposition.

## III.    CONCLUSION.

For all the reasons explained above, and in Plaintiffs' moving papers, Plaintiffs respectfully request that the Court grant their motion, approve the Notice attached as Appendix A, and order Defendant to provide contact information for the potential class

/ / /

/ / /

/ / /

members forthwith and post the notice at all locations in Metro-DC where its non-exempt employees perform cleaning work similar to that performed by Plaintiffs.

Dated:  September 26, 2007                Respectfully submitted,

**D.C. EMPLOYMENT JUSTICE
  CENTER**
Arthur P. Rogers (DC Bar 390844)
727 15 Street NW, 2nd Floor
Washington, DC  20005
Tel: (202) 828-9675
Fax: (202) 828-9190

**DAVIS, COWELL & BOWE, LLP**
  /s/ Mark Hanna
George R. Murphy (DC Bar 75200)
Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
1701 K Street NW, Suite 210
Washington, DC  20006
Tel: (202) 223-2620
Fax: (202) 223-8651

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CARLOS CASTILLO, et al., | ) | Case No. 07-cv-1195 (CKK) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| P & R ENTERPRISES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NOTICE OF PENDING CLASS ACTION

TO:  All workers who were employed by P & R Enterprises, Inc. (we will refer to this company as "Defendant") cleaning buildings at any time since July 1, 2004 to the present.

1.    <u>What is this notice about?</u>

The purpose of this Notice is to tell you about a collective lawsuit in which you may be eligible to become a member, to tell you of how your rights may be affected by this lawsuit, and to give you information about how to join the lawsuit if you wish to do so.

2.    <u>What is the lawsuit about?</u>

Carlos Castillo and Carlos Flores (we will call them "the Plaintiffs") worked for Defendant in the District of Columbia between July 1, 2004 and November, 2006. They have sued the Defendant, claiming, among other things, that:

> Defendant failed to pay them overtime wages equal to one and one-half times their regular rate of pay for all hours worked in excess of 40 in a workweek.  For example, if an employee's regular rate of pay was $10.00/hour, they should have been paid $15.00/hour for hours they worked over 40 in a workweek.

They seek to be paid for the overtime they worked, plus an equal amount of money as liquidated damages, plus their attorneys' fees and costs.



EXHIBIT
Appendix
A

Plaintiffs contend that Defendant violated two laws by not paying overtime: the federal Fair Labor Standards Act ("FLSA") and the District of Columbia's Minimum Wage Act Revision Act ("DC-MWA").

Plaintiffs bring these claims as a collective action. This means they have brought the lawsuit for themselves and for all other workers who are "similarly situated" to them in terms of these claims.

For the federal FLSA overtime claim, workers who are "similarly situated" are those who were employed by Defendant to clean buildings since July 1, 2004 and the present, and who were not paid time and one-half for the hours they worked over 40 in a workweek. This includes employees who cleaned buildings in Maryland and Virginia, as well as in the District of Columbia.

For the DC-MWA overtime claim, workers who are "similarly situated" are those who were employed by Defendant to clean buildings in the District of Columbia since July 1, 2004 and the present and who were not paid time and one-half for the hours they worked over 40 in a workweek.

Defendant will argue to the Court that it complied in full with all applicable laws and deny any wrongdoing and/or liability to Plaintiffs or any other past or present employee.

The Court has not made any rulings on whether the Plaintiffs or Defendant are right. Nothing in this Notice should be understood as a statement about who the Court believes is right or may be right. That decision has not been made and will be made only after further proceedings.

3.    Why did I get this notice?

You received this notice because the lawyers for Plaintiffs and/or Defendant have information that indicates that you are potentially a class member in this case, either for the federal FLSA overtime claims or for the DC-MWA overtime claims.

If you know other employees who worked for Defendant cleaning buildings at any time since July 1, 2004, and did not get a copy of this Notice, you may tell them to call the Plaintiffs' lawyers at (202) 828-9675 ext. 18 to get a copy of this notice.

4.    What are the decisions that I need to make?

If you believe you worked more than 40 hours in a workweek for Defendant and were not paid one and one-half your regular rate of pay for the hours you worked over 40, you may have an overtime claim against Defendant.

You may join this lawsuit – that is, you may "opt in" – as long as you complete and mail a "Consent to Join Action" form on or before _____, 2007. A Consent to Join Action form is enclosed, and you can obtain additional copies from Plaintiffs' lawyers at the addresses below.

There is a two-year statute of limitation on any claim you may have for unpaid overtime under the federal FLSA. This time may be extended to three years if Plaintiffs can prove that the Defendant's violation of the FLSA was willful. Willful means that the Defendant knew or should have known that it was required to pay overtime wages, but failed to do so.

If you were employed by Defendant in the District of Columbia, there is a three-year statute of limitations on any claim you may have for unpaid overtime under the DC-MWA.

The statute of limitations means that you can only recover overtime that Defendant failed to pay you in the two or three years before you filed suit. If you join this lawsuit, you will be eligible to recover any unpaid overtime back to two or three years from the date your Consent to Joint Action form is filed in court.

If you sign the Consent to Join Action, you will be a Plaintiff in the case. In addition to any unpaid overtime, you may be eligible to seek damages, called "liquidated damages" equal to two-times any unpaid overtime wages. As a Plaintiff, you may have to answer questions about your overtime claim and you may have to testify at a deposition or in court. If Defendant wins the lawsuit, and the Court orders that Plaintiffs pay Defendant its costs, you may be required to share in liability for Defendant's costs.

If you do not want to be a Plaintiff in this case, you do not need to anything. You will not be affected either way by any decisions the Court makes about whether Defendant violated the law.

If you choose not to join this suit, you are free to file your own lawsuit. If you do not join this lawsuit, the statute of limitations will continue to run against any overtime claim you may have, until the time that you bring a lawsuit yourself. For example, if you decide to file your own lawsuit and you wait until November 2007 to file your lawsuit, you will only be able to collect unpaid overtime from November 2005 until the present, or until the time you stopped working for Defendant, or from November 2004 if you worked in the District of Columbia or if the court decided Defendant willfully violated the federal FLSA.

5.    What are my protections against retaliation?

It is against the law for anyone to retaliate against any potential "class member" for exercising his or her rights in this case. **If you think anyone has retaliated against you, or has threatened to retaliate in any way, call the D.C. Employment Justice Center immediately at (202) 828-9675, ext. 18**.

6.    <u>Who will represent me if I join the lawsuit?</u>

If you choose to join this lawsuit, your interests will be represented by the Plaintiffs through their attorneys as counsel for the class.  The counsel for the class are:

| | |
|---|---|
| Arthur P. Rogers | Mark Hanna |
| D.C. EMPLOYMENT JUSTICE CENTER | Joni S. Jacobs |
| | DAVIS, COWELL & BOWE, LLP |
| 727 15th Street, NW, 2nd Floor | 1701 K Street, NW, Suite 210 |
| Washington, DC 20005 | Washington, DC 20006 |
| Tel. (202) 828-9675 ext. 18 | Tel. (202) 223-2620 |

7.    <u>What should I do if my address changes?</u>

**CONTACT THE ATTORNEYS ABOVE IF YOU CHANGE YOUR ADDRESS.**
Without a current address, it may not be possible to keep you informed of developments in the case.

8.    <u>Who can I contact if I want further information?</u>

If you have questions about the settlement or need help understanding this Notice, you can contact the D.C. Employment Justice Center by writing or calling:

D.C. EMPLOYMENT JUSTICE CENTER
727 15th Street, NW, 2nd Floor
Washington, DC 20005
Tel. (202) 828-9675, ext. 18

**<u>DO NOT</u> CALL THE COURT OR THE CLERK OF THE COURT.**

**PERMISSION TO CONTACT YOU HAS BEEN GRANTED BY THE UNITED STATES DISTRICT COURT.  HOWEVER, THE COURT TAKES NO POSITION ON WHETHER PLAINTIFFS OR DEFENDANT ARE RIGHT.**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CARLOS CASTILLO, et al., | ) | Case No. 07-cv-1195 (CKK) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| P & R ENTERPRISES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## CONSENT TO JOIN ACTION

(Only complete and mail this form if you want to be a Plaintiff and sue the Defendant under the federal FLSA and/or the DC-MWA. If you do not submit this form in a timely manner, you will not be able to pursue claims. If you choose this option, you will be a Plaintiff in the case. By becoming a Plaintiff, you may be eligible to seek damages, called "liquidated damages" equal to two-times any unpaid overtime wages. While the suit is proceeding, you may be required to provide information, sit for depositions, and testify in court.)

**MY NAME:** _____

**MY ADDRESS:** _____

_____

**MY TELEPHONE NUMBER (if any):** _____

___    I hereby agree and consent to be a party plaintiff in a lawsuit under the overtime and minimum wage provisions of the Fair Labor Standards Act with respect to my labor with P & R Enterprises, Inc.

___    I hereby agree and consent to be a party plaintiff in a lawsuit under the overtime and minimum wage provisions of the District of Columbia Minimum Wage Act Revision Act with respect to my labor with P & R Enterprises, Inc., in the District of Columbia. **(Note: Only check this box if you cleaned buildings in the District of Columbia since July 1, 2004.)**

_____        _____
Signature                                                      Date

**IF YOU CHOOSE TO PARTICIPATE, PLEASE RETURN THIS TO THE FOLLOWING ADDRESS BY _____.**

D.C. EMPLOYMENT JUSTICE CENTER
727 15th Street, NW, 2nd Floor
Washington, DC 20005

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CARLOS CASTILLO, et al., | ) | Case No. 07-cv-1195 (CKK) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| P & R ENTERPRISES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF CARLOS CASTILLO IN SUPPORT OF MOTION FOR NOTICE TO SIMILARY-SITUATED EMPLOYEES

I, Carlos Castillo, declare as follows:

1.      I am a former employee of defendant P & R Enterprises, Inc, and one of the named plaintiffs in this action.  I make this Declaration based on my own personal knowledge.  If called to testify to the statements made herein, I can and will competently testify to them.

2.      I worked for P & R Enterprises, Inc. ("P & R"), for 17 years.  Over that period of time, I worked at several different buildings throughout the District of Columbia.  I received an employee handbook while I worked for P & R, a true and correct copy of which is attached as Exhibit A.  This is the only employee handbook I remember receiving while I worked at P & R.  I did not receive a different handbook when I was assigned to work at a different building.  Instead, the same employment policies applied no matter which building I worked in.  For example, the practices for scheduling, time keeping, breaks, and payroll were the same regardless of which building I worked in.

1

3.     The management structure was the same no matter which building I worked in. My direct supervisor was a Property Manager, who reported to an Area Manager, who reported to Carlos Sanchez, the General Manager. Each Property Managers oversaw only one building. The Area Manager oversaw several buildings. The General Manager oversaw all the buildings. The Area Manager came to the buildings I worked in frequently. The Area Manager would be there for employee meetings, and I would sometimes see the Area Manager when I would clock in for work. The General Manager came to the buildings I worked in when there was a serious issue with the building or to discuss matters with an engineer.

4.     Over the course of my employment with P & R, I have met and spoken with employees P & R who cleaned buildings in Virginia and Maryland. From what these employees told me, the same employment policies applied to them as well. They followed the same practices regarding scheduling, time keeping, breaks and payrolls that I followed as an employee in the District of Columbia. Also, they worked under same management structure—they reported to a Property Manager, who reported to an Area Manager, who reported to the General Manager.

5.     From June 2004 to September 2006, I worked as a Day Cleaner in a building located at 1401 H Street, NW in Washington, DC. I cleaned offices on several floors, and I cleaned the men's bathroom on each floor. I worked on a crew of approximately five employees, who all performed the same kind of work that I did; they cleaned offices and bathrooms and common areas of the building. All of us had the same supervisor and

2

management. The same employment policies that applied to all of us.

6.    When I worked for P & R at the 1401 H building, the Property Manager set the schedule for the crew. My schedule did not change. I worked 6:30 a.m. to 3:00 p.m. six days a week. I was to receive an unpaid 30-minute break on Mondays through Fridays, but I did not get a break when I worked other days. I was paid only straight-time for the work I did, even if I worked more than 40 hours in a workweek.

7.    All of the employees on the crew took a 30-minute unpaid break at the same time. We did not clock out for our breaks. We were required to be "on call" during our breaks and had to answer any calls that came in. Frequently we had to return to work when we were on an unpaid break. When I did so, I would not get to make up the break time I lost at some other point during my shift. My supervisor knew that I was working on my unpaid breaks because often the calls to return to work came from my supervisor. Also, sometimes I would see my supervisor when I was going back to work and sometimes I would tell him or her that I had to respond to a call while I was on my break. I was not paid for the time I had to work on my unpaid breaks. I do not believe the other employees who also had to work on their breaks were paid for that time.

8.    Before I started working at the 1401 H Building, I was assigned to work in two different buildings during the same period of time. I would work a shift cleaning one building, clock out, and then go work another shift cleaning a different building. Although my combined hours were more than 40 in a workweek, I was paid only straight-time for all the hours he worked. I believe that other employees also worked more than 40 hours in a

3

workweek in this same way, because I would see them working in the same buildings I was working in.

9.      Just like at every building I worked in while employed by P & R, I punched in and out on an electronic time clock at the 1401 H building.  The Property Manager collected the time cards and submitted them to the Area Manager.   The Area Manager submitted them to a central payroll department for P & R.

10.     Sometime in 2005 or 2006, I talked to Carlos Sanchez, the General Manager, about the overtime I felt I was due.  He told me that P & R does not pay overtime to anyone.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24 day of September, 2007, at _Andrews South, Carolina_.

_____
Carlos Castillo

JANUARY 2001

# EMPLOYEE
# HANDBOOK

5681 Columbia Pike, Suite 101
Falls Church, Virginia 22041
tel 703.931.1000
fax 703.931.7271

**P&R**
ENTERPRISES

EXHIBIT

A

# FOREWORD

### Welcome to P&R Enterprises, Inc.

We are proud of P&R's long tradition of providing excellent service to our clients, and believe our employees are the reason we have grown to become the third-largest janitorial services company in the Washington, DC area.

We are pleased to welcome you as an employee of P&R. We have a long history in the community for giving our employees an opportunity to advance in the company. Your advancement can be achieved by giving us your best effort at all times. We hope you will take advantage of the opportunity to become a full-time member of our team.

As the first step in helping you develop a career with P&R, we have prepared this employee handbook to make you familiar with our employment principles, benefits, policies and procedures.

Please bear in mind that our policies may be updated from time to time. We will attempt to make you aware of changes by posting them on the company bulletin board located at your work site, through memos accompanying your paycheck, through the company newsletter, and/or the P&R Internet site located at: "http://www.p-and-r.com".

It is our hope that we will both benefit from your time spent with our company. Please feel free to let us know how we can make your employment with P&R mutually rewarding.

Carlos Sanchez
Director of Operations

# TABLE OF CONTENTS

I    INTRODUCTION ...................................................... 2

II    DEFINITIONS OF EMPLOYMENT STATUS ........... 4

III    EMPLOYMENT POLICIES ....................................... 6

IV   WAGE AND SALARY POLICIES ............................ 9

V    EMPLOYEE BENEFITS AND SERVICES ............ 11

VI   EMPLOYEE COMMUNICATIONS ......................... 17

VII  EMPLOYEE SAFETY AND HEALTH ................... 18

VIII  STANDARDS OF CONDUCT .............................. 22

IX   ATTENDANCE STANDARDS .............................. 33

X    ACKNOWLEDGEMENT FORM ........................... 39



**P&R**
ENTERPRISES

# INTRODUCTION

This handbook has been prepared to introduce you to our company and acquaint you with current company policies, rules, pay and benefits.

The information contained in this handbook applies to all employees of P&R. It is presented as a matter of information only and its contents should not be interpreted as a contract between the Company and any of its employees.

Please read this handbook carefully and keep it handy for future reference. You should become familiar with its contents. However, this handbook is only a summary of policies, which P&R may change from time to time.

## CHANGES IN POLICIES

Since our business is constantly changing, we expressly reserve the right to change any of our policies, rules, pay and benefits including those covered here, at any time. Changes will be effective on dates determined by the Company. No Supervisor or Manager or his/her designated representative has any authority to modify the policies.

If you are uncertain about any policy or procedure, please check with your Supervisor or the Personnel Director.

## EMPLOYMENT RELATIONSHIP

Your employment with the Company is entered into voluntarily and you are free to resign at any time. Similarly, P&R is free to terminate the employment relationship at any time, with or without cause.

## EQUAL EMPLOYMENT OPPORTUNITY (EEO)

P&R complies with applicable equal employment opportunity laws and does not discriminate on the basis of race, color, religion, sex, national origin, age, sexual orientation, disability, or any other legally-protected classification. P&R also makes reasonable accommodations for disabled employees. (An employee who believes he or she has a disability and requires an accommodation should inform his or her supervisor or a director so that the employee's request can be evaluated.)

P&R's Equal Employment Opportunity policy applies to all areas of employment, including, but not limited to, recruitment, hiring, training, promotion, compensation, benefits, transfer, and social and recreational programs.



**P&R**
**ENTERPRISES**

2

If you have any questions concerning P&R's Equal Employment
Opportunity policy, you are encouraged to bring them to the attention of
your supervisor and/or any officer or Co-Director of P&R, who will
answer them.

3

**P&R**
ENTERPRISES

# DEFINITIONS OF EMPLOYMENT STATUS

The following terms will be used to describe the classification of employees and their employment status:

<u>Exempt</u> - Employees whose positions meet specific tests established by the Fair Labor Standards Act (FLSA) and therefore are exempt from overtime pay requirements.

<u>Non-exempt</u> - Employees whose positions do not meet FLSA exemption tests and therefore are paid one and one-half times their regular rate of pay for hours worked in excess of 40 per week.

<u>Full- time/Part- time</u> - Full-time employees are scheduled to work 35 hours per week or more in one position. Part-time employees are scheduled to work less than 35 hours per week. Employees are eligible for benefits when applicable service requirements are met.

<u>Field Employees</u> - Full-time and part-time employees below the rank of Area Supervisor whose primary work site is other than corporate offices. Specific exceptions to this category are the administrative staffs at designated locations other than corporate offices.

<u>Probation Period</u> - Employees with less than 90 days of service.

<u>Regular</u> - Employees who have completed the 90 day probation period.

<u>Temporary</u> - Employees who are hired for a pre-established period, usually during peak workloads or for vacation relief. They may work a full-time or part-time schedule. They are ineligible for Company benefits and holiday pay.



**P&R**
**ENTERPRISES**          **4**

**CONDITIONS OF EMPLOYMENT**[1]

I agree and consent to the following items as a condition of my
employment with P & R:

1.      I  authorize investigation of all statements contained in my
        employment application.
2.      I understand that misrepresentation or omission of facts
        called for is cause for dismissal.
3.      Obtain a police clearance, if requested.
4.      Submit to an urinalysis test, if requested.
5.      Be finger printed, if requested.
6.      Present some form of identification which includes
        photograph.
7.      Agree to be photographed.
8.      List previous employers and their telephone numbers.
9.      Agree to random urinalysis testing at a later date.
10.     Fill out all required documents, including W-4 and I-9.

A positive test for "illegal" drugs will be sufficient reason for denial
of employment or termination.

New employees may be issued an I.D. badge and may be fingerprinted,
if requested, when they are hired. The I.D. badge identifies you as an
employee of this Company and must be worn while working so that the
photograph is visible.

New employees are issued a doublet/smock when they are hired. The
doublet/smock is issued from the supervisor to a new employee and
must be returned to the Supervisor by the employee when a transferred
to another building or leaving the Company.

If your doublet/smock is lost, you, the employee, agree to pay for the
doublet/smock, the amount that the Company is charged for purchasing
the doublet/smock.



# EMPLOYMENT POLICIES

## EQUAL OPPORTUNITY

The Company maintains a policy of nondiscrimination with all employees and applicants for employment. All aspects of employment with us will be governed by merit, competence and qualifications, and will not be influenced by race, color, religion, sex, age, national origin, disability, or any other basis prohibited by statute.

All decisions made with respect to recruiting, hiring, and promotions for all the job classifications will be based solely on individual qualifications related to the requirements of the position. Likewise, all other personnel matters such as compensation, benefits, transfers, reduction-in-force, recall, training and education will be administered free from any illegal discriminatory practices.

## PROBATION PERIOD FOR NEW EMPLOYEES

New employees are subject to a 90 calendar day orientation period. During this time, you have the opportunity to evaluate our Company as a place to work, and management has the opportunity to evaluate you as an employee. As during your regular employment, you and the Company each have the right to terminate employment during this probationary period without advance notice and without cause.

The probationary period may involve close and frequent performance evaluations. Upon satisfactory completion of the probationary period, you are eligible to become a regular employee. All employees, regardless of classification, status or length of service, are expected to meet and maintain Company standards for job performance and behavior.

## EMPLOYMENT OF RELATIVES

P&R has no general prohibition against hiring relatives. However, a few restrictions have been established to help prevent problems with safety, security, supervision or morale.

While we will accept and consider applications for employment from relatives, close family members such as parents, children, siblings, spouses or in-laws, these applicants must be first approved by the Area Manager. No more than three family members will be hired, unless there is special written permission from the Vice President of Operations. Relatives will not be hired into positions where they directly or indirectly supervise or are supervised by another family member. Further, relatives will not be placed in positions where they



**P&R**
**ENTERPRISES**                    6



work with or have access to sensitive information regarding a family member.

## EMPLOYMENT OF MINORS

As a general rule, regular employees of the Company must be 18 years old. Occasionally, we hire students or others who are younger, but this is done only under special conditions, must be approved in advance by the Area Supervisor, and must meet Federal and State laws governing the employment of minors.

## PERSONNEL RECORDS

Important events in each employee's history with the Company will be recorded and kept in the employee's personnel file. Performance reviews, change of status records, commendations, disciplinary warnings and educational attainment records are examples of records maintained.

Your personnel file is available for your inspection in the Personnel Office. Contact your Supervisor to make an appointment. Each employee, including those on layoff status and leave of absence, is responsible for notifying the Personnel Department of changes in address, visa or I-9 status, telephone number and/or family status (births, marriage, death, divorce, legal separation, etc.).

## HOURS OF WORK: TIME CARDS

Your time card is a legal record of the hours you are at work, and your paycheck is based on the time recorded on your timecard. Employees will be given five minutes of grace-time for unforeseen circumstances a maximum of two times per pay period. Abuse of this privilege will not be tolerated. Any addition, correction or change on your timecard must be made and initialed by your Supervisor. Time cards are the property of the Company and must remain in the timecard racks. Employees must go to their assigned work area and begin work immediately after punching in on the time clock. Unauthorized punching of any time card will result in dismissal.

If you must leave work early for any reason, notify your Supervisor (See Absence Without Notice and Attendance Standards.).

## PROMOTIONS

We consider employees for promotion, whenever practicable, to fill more responsible positions within the Company. We make every effort

7





to promote the most capable and experienced individual, based on demonstrated ability to assume greater responsibility. At the same time, we may recruit and hire outside the Company to attract the most capable candidate for a particular opening.

Current job openings, including supervisory and management positions, and the steps necessary to apply for them, are posted on bulletin boards at the home office. If you are not able to come to the home office, please call for information.

## RESIGNATION

If you decide to leave the Company, please advise your Supervisor or the Area Supervisor. We appreciate receiving two weeks notice prior to your date of departure so that an orderly transition can be made. Upon termination, you must turn in Company property and obtain appropriate clearances.

## OUTSIDE EMPLOYMENT

Full-time Supervisors, Project Managers and Non-Supervisory Employees may engage in other work outside of P&R, provided it does not interfere with their performance in their regular position. Written authorization must be obtained from the Operations Manager prior to commencement of any other employment. Any outside employment that interferes with the performance of an employee's responsibilities for P&R will not be tolerated and may result in termination.

No Supervisor may work for a competing janitorial company without written authorization.

Employees may not contract with or perform any work for a customer or tenant of a customer during the employee's shift when compensation for said work is paid directly to the employee. Any extra jobs performed by employees during time when the employee is "on the clock" for P&R must be handled and billed through P&R.

P&R employees may arrange to perform work for a customer or tenant of customer on the employee's own time; however, such work may not be performed while the employee is working for and being paid by P&R. While a P&R employee performs such outside work for a P&R customer for which the employee receives extra compensation from the customer, he/she will not be covered by Company insurance policies. Therefore, if you are injured while performing an "extra job," you will not be covered by P&R's Worker's Compensation Insurance.



**P&R**
ENTERPRISES                    8

# IV  WAGE AND SALARY POLICIES

We strive to maintain rates of pay at P&R that are comparable or superior to those of other companies in our industry for similar kinds of work. All wages are equal to or exceed the regulations and standards of local, state, and federal laws.

P&R wants to help you grow with the Company. If you wish to improve your position, then you must start by having good attendance, being dependable, showing enthusiasm for your job and, most importantly, setting an example. Of course, employees who are promoted to higher grade positions have the opportunity to earn additional pay.

## PAYDAYS

The Company has to (2) paydays per month, the 10th and the 25th.

1.  Work performed between the 1st and the 15th of the month will be paid on the 25th of the month.
2.  Work performed between the 16th and the end of the month will be paid on the 10th of the following month.
3.  If the payday falls on a weekend or holiday, checks will be given on the closest working day. Example: if payday falls on Saturday, we will pay you on Friday. If payday falls on Sunday, we will pay you on Monday.

Paychecks will be issued by the Supervisor, or the person designated by the Supervisor, at the building or job site where you report to work during normal working hours.

If you work in the District of Columbia and you are terminated by the Company, your Supervisor will issue you a <u>Personnel Action Form</u> stating the number of hours that are due to you. Hours will be verified. To receive your final paycheck, you must bring this form to the main office after 9:00 am and before 3:00 pm. Your check will be issued to you between 4:00 pm and 6:00 pm by the next working day.

If you work in Maryland or Virginia and you are terminated by the Company, your check will be issued to you on your next regularly scheduled payday.

Upon leaving the Company for any reason, you must turn in your uniforms, doublets /smocks, keys, ID badges and any other Company property that was issued to you.  If you voluntarily leave the Company, your paycheck will be issued at the Main office or the building where

**9**



**IV** 

you worked on your regularly scheduled payday, depending upon when you last worked.

No employee should request, nor should any Supervisor cash, any other employee's payroll check.

### PAY ADVANCES
No salary advances will be granted for any reason.

### OVERTIME PAY
Non-exempt employees will be paid time and one-half for authorized hours worked in excess of forty hours in one week. All overtime work by non-exempt employees must be authorized in advance by your Supervisor.



# P&R
**ENTERPRISES**

10

# V EMPLOYEE BENEFITS AND SERVICES

Our Company offers a comprehensive package of employee benefits programs for its employees. Union employees should consult their collective bargaining agreement for details on current coverage. Non-union employees should consult the benefits booklets available from Personnel/ Human Resources.

## SOCIAL SECURITY

All employees are covered by the Federal Social Security Act. A required percentage of your salary is deducted to pay your portion of this protection, and the Company matches your deduction dollar for dollar.

## STATE UNEMPLOYMENT INSURANCE

This State-mandated program is funded entirely by employers in the various states and federal jurisdictions where we operate. The program provides weekly benefits if you become unemployed through no fault of your own or due to circumstances described in the law. Unemployment compensation premiums are paid 100% by the employer to compensate those individuals who are fully eligible for this benefit.

## WORKERS' COMPENSATION

The Company carries insurance to cover the cost of work-incurred injury or illness. Benefits help pay for your medical treatment and part of any income you may lose while recovering. Specific benefits are prescribed by law depending on circumstances of each case. To be assured of maximum coverage, work-related accidents must be reported immediately to your Supervisor who will file a timely claim.

## VACATIONS

Employees not covered by a collective bargaining agreement will be eligible for paid vacation in accordance with the terms of the contract in the building where they are assigned.

Vacation benefits apply only if your service is continuous. Vacation must be scheduled with your Supervisor at least one (1) month in advance. To satisfy your preferences as well as meet the staffing needs of the department, discuss your vacation plans well in advance with your Supervisor. Vacation accrual commences the date of your anniversary of employment with the Company. Every effort will be made to honor your request for vacation subject to eligibility, availability of replacement, and the ability of the Company to continue normal operations.



**11**

Vacation will be paid only on regular paydays. No more than one week vacation can be carried over to the next year.

## HOLIDAYS

Eligibility for holiday pay is based on the terms of the contract in each building. Employees not working at a specific building should contact the Human Resources Department for information about holiday pay eligibility.

## ABSENCE WITHOUT NOTICE

For us to operate our business effectively, we ask that you keep us informed of your status when you are off work because of illness or accident from any cause. If you fail to notify us after three (3) consecutive days of absence, we will presume you have resigned, and you will be removed from the payroll. If you must leave work for any reason before the end of the day, you must inform your Supervisor.

## LEAVE OF ABSENCE WITHOUT PAY

Leaves of absence without pay may be granted at the Company's discretion to regular employees where unusual or unavoidable circumstances require prolonged absence.

Leave of absence may be granted up to a maximum of one hundred eighty (180) days after completion of one (1) year of continuous employment.

Any leave of absence will be determined on an individual basis. Any employee requesting a leave of absence must obtain written permission from his/her Supervisor stating why the leave is being requested and for how long. This, however, must be approved by the Area Manager and the Operations Manager. If the request for leave of absence is granted, the employee will not lose benefits or seniority as long as he/she returns to work on the date previously agreed upon. (However, an employee will not accrue vacation or receive holiday pay while on a leave of absence without pay.)

## FAMILY AND MEDICAL LEAVE

General Requirements. You are eligible for up to 12 weeks of unpaid leave during a 12 month period: (1) to care for a child born to or placed with you for adoption or foster care; (2) your own serious health condition; or (3) the serious health condition of your spouse, parent or child if you have been employed by the Company for at least 12 months and have worked at least 1,250 hours during the previous 12-month



**P&R**
ENTERPRISES

**12**

# V

period. The 12-month period of entitlement is measured backward from the date you use any FMLA leave. Leave may be taken on an intermittent or reduced work schedule basis if medically necessary. If you work in the District of Columbia, please consult with Human Resources regarding your leave under the D.C. FMLA.

<u>Leave Is Unpaid</u>. FMLA leave is unpaid leave. Employees must use all accrued paid leave, including vacation, before taking unpaid leave.

<u>Notice of Leave</u>. If your need for FMLA leave is foreseeable, you must give the Company at least 30 days prior written notice. Where the need for leave is not foreseeable, you are expected to notify the Company as soon as practicable, generally within 1 to 2 business days of learning of your need for leave.

<u>Medical Certification/Fitness For Duty</u>. You will be required to provide a certification from the appropriate health care provider for medical leaves. The form may be obtained from Human Resources. The medical certification must be provided within 15 days after it is requested, or as soon as reasonably possible under the circumstances. Failure to provide requested medical certification in a timely manner may result in denial of leave until it is provided. You will be required to present a fitness-for-duty certificate upon return to work following your own medical leave. You will not be permitted to work until a fitness-for-duty certificate is presented.

<u>Medical And Other Benefits</u>. During the leave, the Company will maintain your health benefits on the same conditions as if you had continued working. If your leave is unpaid, you must make arrangements with Human Resources to pay your portion of the premium.

<u>Returning From Leave</u>. An employee taking a leave under this policy is generally entitled to return to his or her same position or to an equivalent position with equal benefits, pay and other terms and conditions of employment.

The application of this policy and the procedures set forth herein may be modified in accordance with changes in applicable law.

## MILITARY LEAVES OF ABSENCE

Leaves of absence without pay for military or Reserve duty are granted to full-time and part-time regular employees. If you are called to active duty or to Reserve or National Guard training, or if you volunteer for

**13**



P&R
ENTERPRISES

same, you should notify your supervisor and submit copies of your military orders to him or her as soon as practicable. You will be granted a military leave of absence without pay for the period of service, in accordance with applicable federal and state laws. If you are a reservist or a member of the National Guard, you are granted time off without pay for required military training. Your eligibility for reinstatement after your military duty or training is completed is determined in accordance with applicable federal and state laws.

## JURY DUTY

It is the policy of P&R to compensate, at a pro rated amount, employees who are summoned for jury duty during the normal work shift at P&R. To be eligible for this benefit you must be employed by the Company for a minimum of ninety (90) days. This benefit is limited to no longer than one (1) month of jury duty service. Your must show proof that you have been summoned and for what period you have served on jury duty. If you meet these qualifications, the Company will pay you the difference between what you are paid by the court and what you would have earned for a normal work day.

## SHORT TERM DISABILITY

1.      Definition of Short Term Disability

        Compensation paid to an employee who becomes temporarily unable to carry out his/her regular occupational duties as a result of an illness, injury (not job related) , or pregnancy.

2.      Length of Short Term Disability Policy

        This policy extends for a maximum period of ninety (90) days. The length of leave will depend upon such factors as the nature of the disability, and the employee's number of years of service with P&R, and the employee's work shift.

3.      Employment requirements

        A.      Must be either a Building Supervisor, Project Manager, Manager-in-training, or Full-time administrative employee at designated locations.

        B.      Must be employed by the Company for one (1) year of continuous service.



**14**

V

      C.    Must be under a physician's care and have a signed statement from the physician generally explaining the nature of the disability.

      D.    Must use all available paid leave, including vacation, before using this benefit.

      E.    Short term disability will run simultaneously with FMLA leave.

4.    Salary Benefits: The employee is eligible only if he/she is not compensated by any other plan, insurance or program.

      A.    After one (1) year of continuous employment, the employee is eligible for one month of leave without pay.

      B.    After two (2) years of continuous employment, the employee is eligible for two (2) months of leave without pay.

      C.    After three (3) years of continuous employment, eligible for 50% of pay for a period of up to two (2) months.

      D.    All pay amounts equated to regular shift hours and/or salary.

5.    Executive Management Review of Short Term Disability Cases

Executive Management has the right to review individual cases of Short Term Disability and make adjustments in all aspects of this policy, as they deem it necessary.



**P&R**
ENTERPRISES

**15**



### RETURN TO WORK

If you are on a Short-Term Disability or Long-Term Disability Leave of Absence, you are expected to return to work when your doctor determines that you are able to resume normal duties. We require your physician's release before reinstatement to the active payroll. If you wish to extend your leave beyond this point, and have exhausted your FMLA leave entitlement, you must apply for a personal leave of absence.

A physician's release may also be required when returning to work from sick leave or other, short-term, medically- related absences. Your Supervisor will advise you of this requirement, which depends on case-by-case circumstances.

### JOB COUNSELING

If you are concerned about your job performance or if you wish to talk about job prospects in line with your career interests and abilities, you may arrange for a counseling discussion by calling the main office.



ENTERPRISES          **16**

# VI EMPLOYEE COMMUNICATIONS

## "SECOND OPINION"

P&R's policy gives all employees the right to have a direct recourse to any level of management for a conference on complaints or problems. This program represents a chance to receive an objective opinion from management and gives an employee the opportunity to speak on his/her behalf. This program also establishes a two-way communication between management and employee. A second opinion will not be applicable to employees working under collective bargaining agreements, because they have their own grievance procedures.

*PROCEDURES FOR A "SECOND OPINION"*

Step 1          All employees should first raise their complaints or
                problems with their Supervisor/Project Manger.

Step 2          If the employee disagrees with the supervisor's
                response, he/she should inform his/her Supervisor/
                Project Manager that he/she is requesting a
                conference with the Area Manager.

Step 3          If the employee still feels dissatisfied with the Area
                Manager's response, he/she should contact the
                Operations Manager to request a conference.

                The employee should give a detailed account of his/
                her complaint to the Operations Manager.

Step 4          The Operations Manager may conduct whatever
                investigation he or she feels is appropriate.

## BULLETIN BOARDS

Each department or building has a bulletin board or designated area that is used to communicate important Company information. The P&R Supervisor or Area Manager must approve all material posted on the bulletin board or in the designated area for posting information. The bulletin board will not be used for communicating any non-company or non-contract information.

You should read the information posted on the bulletin board in your department or building. This includes the Standards of Conduct, Safety Rules and Management memos.



**P&R**
ENTERPRISES

# EMPLOYEE SAFETY AND HEALTH

## VII

P&R makes every effort to provide safe working conditions for our employees. We observe the safety laws of the governmental bodies within whose jurisdictions we operate. No one will knowingly be required to work in any unsafe manner. Safety is every employee's responsibility. Therefore, all employees are requested to do everything reasonable and necessary to keep the Company a safe place to work.

### SAFETY POLICY

Insurance costs (worker's compensation, liability and auto) constitute, after payroll and payroll taxes, the single largest cost of our business. Accident prevention through the control of hazards which may cause injury or damage to our employees, customers, or property is a prime concern to all levels of management and to all employees of P&R.

Accidents result from either an unsafe act or an unsafe condition, or a combination of the two. Accidents do not just happen, they are <u>caused</u>. It is, therefore, essential that all employees of P&R actively participate in our Corporate Safety Program, if we are to prevent accidents.

Safety will be of the utmost concern in the training of personnel, use of equipment and facilities, and the development of new methods and processes.

### RIGHT TO KNOW

A copy of P&R's Hazard Communication & Chemical Safety policy is available for review at the main office. In compliance with the Hazard Communication Standard, the Safety Coordinator has supplied the corporate Communications Center with Material Safety Data Sheets ("MSDSO) on all hazardous chemicals. Additionally, the major components of the P&R Training Program are based on these requirements. Occupational safety is one of the most important topics covered in our corporate training program. P&R is determined to provide our employees with a complete working knowledge of general safety practices, safe chemical usage, and the proper use of various kinds or equipment that is required for the job.

It is essential that each employee actively participate in the Corporate Safety Policy to ensure the safety of all employees. Therefore, P&R encourages all employees to learn and practice safe operations in his/ her areas of responsibility.



**P&R**
**ENTERPRISES**                    **18**

# VII

The following information outlines responsibilities that affect employees, Supervisors, Area Managers and safety inspectors.

Building Supervisors will encourage their employees to work in safe areas and under safe conditions. They will set an example for their employees. It is their responsibility to enforce safety practices.

Supervisors will make inspections for unsafe physical conditions and unsafe employee work practices. They will investigate accidents, and prepare an accident report that will be submitted to the appropriate main office personnel.

Chemical training for employees will be provided by the Supervisor. Supervisors will conduct safety orientation training for new employees to familiarize them with hazardous chemicals and the uses of various types of equipment.

After presentation of this information is completed, the Supervisor will obtain a written acknowledgment from the employee, stating that he/she has received proper training in this area.

Employees will maintain their work areas in a safe and orderly condition. They agree to follow safety regulations and instructions given by the Supervisor. Employees must report all accidents to their Supervisor immediately. Employees must agree to support the Corporate Safety Policy to their full potential. Employees will inspect their work equipment at the beginning and end of each work shift to ensure that their equipment is in proper working condition. All defective material must be reported to the Supervisor. Employees shall report any hazardous conditions to the Supervisor as soon as they are discovered. Employees will acknowledge in writing that they have been trained in the use of hazardous chemicals and equipment.

**P&R**
ENTERPRISES



## VII

### LIFE-THREATENING ILLNESSES

We are committed to providing fair and equal opportunity to all employees, including those who have a life-threatening illness (cancer, AIDS, cardiopulmonary disease, etc.). We are also committed to providing a safe work environment that meets or exceeds state and federal regulations. Consequently, employees who have a life-threatening illness will be treated like other employees, as long as they meet performance standards and medical and other evidence indicates that their condition is not a threat to themselves or to others.

We also believe all information regarding an employee with a life threatening illness should remain private and confidential.

We ask all employees to treat employees having a life-threatening illness with compassion and understanding.

### FIRES AND EMERGENCIES

IN CASE OF EMERGENCY:
NOTIFY YOUR SUPERVISOR IMMEDIATELY!

### ACCIDENTS

No matter how insignificant an injury may seem at the time of occurrence, you should notify your Supervisor immediately.

Advise your Supervisor or call the main office about anything on the job that is a potential danger or anything that might cause you to be injured.

If you see ANYONE slip and fall, report it to your Supervisor immediately.

In cases where the injury is serious enough to require an ambulance, contact your Supervisor, and he/she will call one.

Use chemicals only as directed by your Supervisor.

Never mix chemicals.

DO NOT use chemicals from unlabeled containers.



**P&R**
ENTERPRISES          **20**

# VII

## SAFETY GUIDELINES

Employees should follow these safety guidelines.

1.   Report all unsafe conditions regarding your work to your Supervisor.
2.   Report all damaged or unsafe equipment to your Supervisor.
3.   No employee should use any equipment or supplies that he/she has not been trained to use.
4.   No employee should attempt to repair and/or remove any parts from equipment.
5.   All equipment must be kept clean.
6.   All janitor closets must be kept neat and clean.
7.   Prepare chemical solutions according to label directions.
8.   Frayed cords and worn plugs should be reported to the Supervisor.
9.   Only extensions cords that are approved by the Supervisor should be used.
10.  All floor machines, vacuums, etc. must be unplugged when not in use.
11.  ALWAYS post caution signs when floors are slippery and/or wet. Spills should be removed immediately.
12.  All new employees are given a chemical awareness form to take to the building. Please sign this form and give it to your Supervisor, who will give you instructions in the use of the various chemicals used at that particular building.



**P&R**
ENTERPRISES

# VIII STANDARDS OF CONDUCT

Our employees are expected to be aware of their responsibilities to the company and to co-workers.

Generally, we take a constructive approach to disciplinary matters to ensure that actions that would interfere with operations or an employee's job do not continue.

## THEFT PREVENTION

In order to prevent pilferage, which is very difficult to detect, the Company may require employees to submit to physical inspections of all belongings removed from all locations. The inspections will be held periodically by supervisory personnel. These inspections will be conducted both on a routine basis and when suspicion of theft arises.

Although we know that the great majority of our employees are honest and have never engaged in pilferage or theft, we must ask that you understand the Company's zero tolerance for theft of any kind. Theft is a very serious problem and is detrimental not only to the Company, but in the long run, to the building and to the jobs of all employees.

If an inspection request is made of you, it may be routine in nature. No accusation of dishonest conduct should be assumed simply because the employee's belongings are inspected. By inspecting the property of its employees, the Company does not intend to cause embarrassment or hurt feelings or to imply guilt. However, all employees are expected to comply with inspection requests. Failure to comply with an inspection request will lead to disciplinary action, up to and including discharge. Your participation in the inspection policy is a condition of your continued employment. In addition, the use of profanity or degrading language, when an inspection is requested or made, will also be considered a serious offense, subject to disciplinary action.

Since this program will benefit all concerned, we expect and appreciate your full cooperation.



**P&R**
**ENTERPRISES**

22

# VIII

The following security measures may be taken by the Company:

> Packages
> All packages leaving the facilities are subject to search and examination.
>
> Purses, handbags, briefcases, duffels, etc.:
> All purses, handbags, etc. are subject to search, upon request. Purse, handbag, and briefcase searches may be conducted from time to time, or on a daily basis.

Any employee found to have engaged in THEFT is subject to IMMEDIATE DISMISSAL and possible CRIMINAL PROSECU-TION.

No employee may remove any property, other than his or her own personal belongings, from the worksite without A SIGNED LETTER FROM MANAGEMENT AUTHORIZING REMOVAL OF THE SPECIFIC ITEM.

5.    There are certain things that you can do to help prevent theft in your building. Report any of these to your Supervisor immediately:

   a.    Report any doors or windows found open when you report to work.
   b.    Report anything strange or unusual.
   c.    Any coins found on the floor should be placed on top of the nearest desk.
   d.    If you suspect any of your fellow workers or any of the customer's employees of misconduct, you should report this to your Supervisor.

6.    Should a theft or mysterious disappearance occur within a customer's building, you may be asked to submit to an inspection.

## VIOLATIONS OF STANDARDS
Violations of our standards may subject an employee to one or more of the following forms of disciplinary action: discharge, suspension, oral warning or written warning.



**VIII**

Although there is no way to identify every possible violation of standards of conduct, the following is a partial list of infractions which will result in disciplinary action up to and including termination:

1.  Falsification of Company records including, but not limited to, employment application or timecard.

2.  Unauthorized possession of Company or tenant property, fraud, gambling, carrying weapons or explosives, or violation of criminal laws.

3.  Fighting, throwing things, horseplay, practical jokes or other disorderly conduct which may endanger the well being of any employee or Company operations.

4.  Threatening, intimidating, coercing, using abusive language, or interfering with the performance of fellow employees or showing disrespect toward customers.

5.  Insubordination or refusal to comply with supervisor's instructions or failure to perform reasonable duties as assigned.

6.  Use of Company material, time or equipment for the manufacture or production of an article for unauthorized purposes or for personal use.

7.  Conduct which the Company feels reflects adversely on the employee or the Company.

8.  Performance which, in the Company's opinion, does not meet the requirements of the position.

9.  Engaging in such other practices that are inconsistent with the ordinary and reasonable rules of conduct necessary to the welfare of the Company and its employees.

10. Violation of Safety Rules.

11. Other circumstances in which the Company feels that discipline is warranted.

12. Conduct which violates the Company's Sexual/Workplace Harassment Policy.



**P&R**
**ENTERPRISES**

**24**

# VIII

13.  Misbehavior or creating a disturbance with fellow employees, arguing, or showing disrespect toward a customer, personal use of Company supplies, dishonesty, and destruction of property are causes for immediate dismissal.

14.  Theft means taking anything out of the building which you did not take in with you, or which you did not have express permission to remove. Theft is cause for immediate dismissal.

This list is intended to be representative of the types of activities that may result in disciplinary action. It is not intended to be comprehensive and does not alter the employment-at-will relationship between the employee and the Company.

Additional standards of conduct are described in the following sections:

## DRUG-ALCOHOL POLICY
**Purpose.**  Illegal drugs and alcohol misuse can endanger P&R's clients and employees, adversely affect client services and jeopardize P&R's reputation and operations.  This policy is intended to improve service and safety, encourage employees to seek help for drug-alcohol problems and explain P&R's drug-alcohol rules and testing program.

**Scope and Effective Date.**  This policy applies to all applicants and employees of P&R.  This policy supersedes all inconsistent oral statements by P&R supervisors or managers, as well as P&R's prior policy.

**Non-Discrimination.**  To the extent required by law, P&R shall not discriminate against persons with a record of chemical dependency, persons erroneously perceived to be chemically dependent, or against persons who are dependent on alcohol or legal drugs (so long as they do not constitute a threat to safety and are able to perform their essential job functions, with or without reasonable accommodation).

**Confidentiality.**  P&R shall keep test results, drug-alcohol abuse and treatment records, medical records and medical history information, and other information acquired through testing confidential to the extent required by law.  Such information will be maintained in secure files separate from normal personnel files.



**25**

Such information may be disclosed to P&R's managers, supervisors and agents on a need-to-know basis, and will be disclosed as relevant to claims, charges, or lawsuits against P&R or its agents. Such information may also be disclosed to a substance abuse professional for evaluation or treatment purposes. Employees and applicants may obtain copies of their own results and own medical records upon written request and payment of a copying charge.

## Prohibitions and Standards of Conduct

1.    <u>Drugs</u>.  While on P&R time, P&R premises, or operating P&R vehicles, employees may not possess, use, buy, sell, dispense, distribute, manufacture, transfer, transport, or be under the influence of drugs.

2.    <u>Alcohol</u>.  Employees may not consume or be under the influence of alcohol while they are on duty for P&R, operating P&R vehicles or on P&R premises. Employees may not possess, use, consume, buy, dispense, distribute, transfer, transport, or be under the influence of alcohol while they are working or representing P&R except as specifically authorized by P&R management.

3.    <u>Fitness For Duty</u>.  Employees are expected to be able to perform all their job functions safely and effectively.  Employees may not use or consume drugs or alcohol while off the job such that they are under the influence of drugs or alcohol when they report to work.  Employees are also expected to use all prescribed and over-the-counter medications lawfully, safely and correctly.  Employees who are not fit for duty because of illness, fatigue, medications or any other reason should notify their supervisor of their lack of fitness immediately.

4.    <u>Refusals to Cooperate</u>.  Applicants and employees are prohibited from adulterating, diluting or substituting any specimen submitted for testing under this policy, from otherwise obstructing or attempting to obstruct the collection process, from refusing to sign consent-refusal forms, and from refusing to promptly cooperate in testing required by this policy.



**P&R**
**ENTERPRISES**

**26**

#  VIII

**TYPES OF TESTING**

1.  Pre-employment.  Applicants for employment may be asked to take and pass a drug test before they are allowed to begin working or given an unconditional offer of employment.

2.  Post-Accident.  Employees are subject to testing if they appear to have caused an on-the-job incident which results in a fatality, an injury requiring immediate off-site medical treatment, or property damage; or

3.  Reasonable Cause.  Employees are subject to testing if their job performance, appearance, behavior, body odors or speech reasonably cause a supervisor or manager to conclude they are using or possessing drugs or alcohol in violation of this policy, or are adversely affected by alcohol or drug use while on P&R time or premises, or while operating P&R vehicles.

4.  Follow-Up.  Employees who have tested positive or otherwise violated this policy, and not been terminated, or who have entered into a last-chance agreement because of a drug or alcohol problem, are subject to follow-up testing at times and frequencies determined by P&R, for up to 2 years.

6.  Required by Law.  P&R will test commercial motor vehicle operators, and other employees subject to mandatory testing.

**PROCEDURES**

1.  Before applicants or employees are required to provide specimens for testing, they will be provided written notice that they are or will be subject to testing, access to this policy, and an opportunity to consent or refuse to be tested.

2.  Employees and applicants who consent to be tested will be escorted or sent to a nearby medical facility, where they will be required to verify their identity and


**P&R**
**ENTERPRISES**

**VIII**

cooperate in the facility's normal specimen collection procedures. Applicants shall be given a specific deadline to provide specimens. For drug tests, urine specimens will be collected. For alcohol tests of employees, breath or saliva specimens will be collected and tested.

3.  Saliva screening or breath testing devices used for alcohol tests shall be federally-approved and operated by trained technicians. Those technicians shall conduct an initial screen test. If the employee's alcohol concentration exceeds .02, a confirmation breath test shall be conducted in 15-30 minutes. The results of the alcohol confirmation test shall be shown to the employee, recorded, and disclosed to Human Resources.

4.  Employees and applicants may provide urine specimens in private, unless there is a reason to believe that they are attempting to submit an adulterated, dilute or substituted specimen, or otherwise obstruct the collection process. Where such a reason to believe exists, an observed specimen may be collected and/or the test subject treated as refusing to cooperate.

5.  Persons who claim to be unable to provide urine specimens adequate for testing (at least 45 ml) shall be given additional fluids and up to three hours to provide specimens. If they refuse to cooperate in this process or after three hours have not provided an adequate specimen, the collection shall be terminated, and Human Resources shall be notified.

6.  Urine specimens collected for drug testing shall be split into two bottles, a "primary" and a "split," and sealed and labeled in the test subject's presence. Such specimens shall then be sent to a laboratory chosen by P & R which is federally certified to do drug testing and holds all required licenses. The laboratory shall screen the primary specimen for adulteration, dilution and substitution, and for marijuana, cocaine, opiates,



**P&R**
ENTERPRISES

**28**

## VIII

PCP amphetamines (and for such other controlled substances as may be indicated by the circumstances). The laboratory shall confirm all positive screens using Gas Chromatography/Mass Spectrometry. There shall be a chain of custody from collection through confirmation testing.

7.    P&R's lab shall transmit drug test results to P&R's Medical Review Officer (MRO), who shall make reasonable attempts to advise employees and applicants of positive test results, and shall consider and evaluate such persons' explanations for and challenges to such results, if they provide such explanations within three working days of notice of their results. The MRO shall disclose test results and any failure to cooperate shall cause the applicant to be ineligible for employment. Employees and applicants who establish that their test results were caused by lawful substance use shall be treated as passing the drug test.

8.    The MRO shall also advise persons with positive lab results for drugs of their right to have their split specimen retested by a qualified laboratory of their choosing, provided they request such a retest within three working days of notice of their test results, and make satisfactory arrangements to pay for the retests themselves.

9.    Where the MRO is unable promptly to contact an employee, the MRO may ask P&R to direct the employee to contact the MRO immediately. If the MRO is unable promptly to contact an applicant, the applicant's offer of employment may be rescinded or someone else may be hired.

### Consequences

1.    Applicants who do not promptly take and pass a pre-employment drug test will not be hired (and may not be considered for employment for at least 6 months).

2.    Employees and applicants who claim to be unable to



**VIII**

promptly provide specimens adequate for testing will be referred to a physician by Human Resources or P&R's MRO. Such employees will be subject to termination (and applicants treated as ineligible for employment) unless they promptly document, through submission of a doctor's note acceptable to P&R's MRO, that their failure to produce adequate specimens was caused by a legitimate medical condition other than dehydration or situational anxiety. Employees who otherwise refuse to cooperate in required testing will be terminated; applicants who otherwise refuse to cooperate will not be hired.

3. Without prejudice to P&R's policy of at-will employment, employees who test positive for drugs or alcohol will be disciplined, up to and including termination or, at P&R's sole discretion, suspended and referred to a rehabilitation program. Suspended employees may not return to work until they pass a return to duty test, have been approved to return to work by the rehabilitation program, and enter into a last chance agreement acceptable to Human Resources.

4. Employees who possess, use, buy, sell, transfer, dispense, manufacture or transport drugs or alcohol in violation of this or other P&R policies or rules, are subject to discipline, up to and including termination, in P&R's sole discretion.



# VIII

**DEFINITIONS**

1. **"Adulterated Specimen"** means a urine specimen to which a chemical has been added.

2. **"Alcohol"** means any beverage or fluid containing ethyl alcohol.

3. **"Controlled Substance"** means a substance listed in Schedules I-V of Section 202 of the Controlled Substances Act (21 U.S.C. § 812) or in part 1308 of 21 CFR. The term includes but is not limited to, marijuana, cocaine, amphetamines, heroin and other opiates, and PCP.

4. **"Dilute Specimen"** means a urine specimen into which water or another fluid has been poured.

5. **"Drugs"** means controlled substances that are not being used under the supervision of a licensed health care professional or otherwise in accordance with federal law. The term "drugs" also includes so-called designer drugs that are similar to controlled substances, but have no legitimate medical use, and gases or other volatile chemicals that are inhaled intentionally to produce feelings of euphoria, intoxication or stupefaction. The term also includes unlawful substances under federal law, like marijuana, regardless of their legality under state law.

6. **"MRO"** or **"Medical Review Officer"** means the trained doctor P&R has retained to evaluate explanations for and challenges to positive test results, arrange for split specimen tests and retests, and decide when failures to produce adequate specimens have been proven to result from a medical condition.

7. **"Positive test result"** means a test result that was positive on an initial screen, positive on a confirmatory test, and with respect to drugs, reviewed and verified by the MRO as positive.



# VIII

8.  **"Refuse to Cooperate"** means to fail to promptly provide specimens adequate for testing when directed to do so (unless a legitimate medical basis for the failure is established), to submit or attempt to submit an adulterated, dilute or substituted specimen, to refuse to execute consent-refusal forms, or to engage in other conduct that obstructs the collection, testing or medical review processes.

9.  **"Substitute Specimen"** means a urine specimen which is not the urine of the person who submits it.

10. **"Test Positive for Alcohol"** and **"Under the Influence of Alcohol"** mean an alcohol concentration of .04 or more, or behavior, appearance, speech or bodily odors that reasonably cause a trained supervisor or manager to conclude that an employee cannot perform job functions safely or effectively because of alcohol use.

11. **"Under the Influence of Drugs"** means a positive test result for drugs.

## REVISIONS

This policy may be revised from time to time at P&R's discretion. Affected employees will be given notice of such changes.



# IX  ATTENDANCE STANDARDS

Punctuality and regular attendance are essential to the proper operation of any business. These also help you to establish a good working reputation and add to your opportunity for advancement.

If you are unable to report to work at the time which your work shift is scheduled for any reason, notify your Supervisor at least two hours before starting time.

We reserve the right to require a physician's release when an employee returns to work following an absence for medical reasons.

## ANTI-HARASSMENT POLICY

P&R will not tolerate unlawful harassment of its employees. Harassment may consist of unwelcome conduct, whether verbal, physical, or visual, that is based upon a person's protected status, such as his or her race, color, religion, sex, national origin, age, sexual orientation, disability, personal appearance, or other legally-protected status. The conduct forbidden by this policy specifically includes, but is not limited to: (a) epithets, slurs, negative stereotyping, or intimidating acts or comments that are based on a person's protected status; and (b) written or graphic material circulated within or posted within the workplace (including e-mail) that shows hostility toward or otherwise denigrates or negatively stereotypes a person or persons because of their protected status. P&R will not tolerate any form of unlawful harassment against Company employees, whether by executives, managers, co-workers, or by P&R's vendors or clients. Nor will P&R tolerate sexual harassment by its employees of any client, vendor, or other third party. Each employee has a responsibility under this policy to make it known promptly, through the avenues described below, whenever they experience or witness offensive behavior.

Sexual harassment deserves special mention. Unwelcome sexual advances, requests for sexual favors, and other physical, verbal, or visual conduct (including by or through e-mail or voice-mail) based on sex may constitute a violation of P&R's anti-harassment policy, particularly when: (1) submission to the conduct is an explicit or implicit term or condition of employment, (2) submission to or rejection of the conduct is used as the basis for an employment decision (or is threatened to be used as the basis for such a decision), or (3) the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. This policy applies to conduct between members of the same sex as well as members of the opposite sex.

**33**


**P&R**
**ENTERPRISES**



IX

Sexual harassment is not limited to explicit demands for sexual favors, but also may include such actions as sex-oriented kidding, teasing or jokes; repeated offensive sexual flirtations, advances or propositions; obscene or sexually-oriented language or gestures; display or circulation of obscene or sexually-oriented printed or visual materials; and offensive physical contact such as grabbing, patting, pinching or brushing against another's body.

All employees are responsible to help ensure that we avoid harassment and discrimination and other violations of P&R's Equal Employment Opportunity and Anti-Harassment policies. If you feel that you have experienced or witnessed harassment, you are to immediately notify your area manager, or if you prefer, any officer or Co-Director of P&R.

P&R will investigate all such complaints thoroughly and promptly. (P&R will preserve confidentiality to the extent the needs of the investigation permit.) If an investigation confirms that a violation of P&R's Equal Employment Opportunity and/or Anti-Harassment policies or otherwise unlawful conduct has occurred, P&R will take prompt corrective action, including such discipline against the harasser, up to and including immediate termination of employment, as is appropriate in the circumstances. In investigating complaints under this policy, P&R may impose discipline for inappropriate conduct without regard to whether the conduct constitutes a violation of the law and even if the conduct does not rise to the level of violating this policy.

P&R absolutely forbids retaliation against anyone for reporting harassment or discrimination, assisting in making a harassment or discrimination complaint, or cooperating in a harassment or discrimination investigation. Any employee who believes he or she has been retaliated against or threatened as a result of making a complaint of harassment or discrimination, or participating in a harassment or discrimination investigation, should immediately inform his or her Area Manager, Project Manager or any officer or Director of P&R. P&R will take appropriate action to remedy the situation.

### SOLICITATION AND DISTRIBUTION

Solicitation by one employee of another is prohibited while either is on working time. Distribution of literature by an employee is not permitted in work areas at any time. In addition, trespassing, soliciting or distributing literature by anyone outside the Company is prohibited on Company premises.



34

# IX

### TELEPHONE USE

Company telephones, copiers, and computers are to be used for business purposes in serving the interests of our customers and in the course of normal Company operations.

Telephones, copiers, and computers are not to be used for personal business. Do not answer telephones unless your supervisor instructs you to do so.

On occasion, personal calls may be necessary, but we ask your cooperation in limiting them to emergencies or essential personal business and in keeping them as brief as possible. If you must make an outgoing call, see your Supervisor.

### HINTS FOR SUCCESSFUL EMPLOYMENT
### Building Security

1.  After the building has been locked, you are not authorized to allow anyone to enter unless he/she has a key, or if you have been authorized by your Supervisor or the customer to do so.

2.  Always lock the doors after entering the building. Use your door keys when entering a building or room. Never unlock the door; you might forget and leave it unlocked. This is for your safety as well as protecting the customer's property. Never leave doors propped open.

3.  Do not wander throughout the customer's building; you should confine yourself only to those areas you are cleaning or in which your cleaning supplies are kept.

7.  After completion of work, be sure that:

    a.  All cleaning equipment is put away.
    b.  All water faucets are turned off completely.
    c.  All electrical equipment that we are responsible for is turned off.
    d.  All lights are turned off (except night lights).
    e.  All interior doors to be locked have been checked.
    f.  All exterior doors and windows are closed and locked prior to going home.





IX

8.     You are not to give building keys to anyone or to have any duplicate keys made. There are no exceptions to this rule. Do not tag or identify the keys in any way. Notify your Supervisor IMMEDIATELY in case keys are lost.

9.     You are not authorized to bring your children or allow unauthorized persons to enter the customer's building. No substitutions are to be made of employees without prior approval by the Supervisor.

10.    If you are assigned to buildings having "burglary alarm protection," you must observe completely all rules pertaining to its operation. You must not, under any circumstances, give your card or number to anyone. To do so could cause their arrest and your dismissal from the Company.

## YOUR RELATIONSHIP WITH THE CUSTOMER

1.     Do not involve the customer in your personal problems.

2.     The customer hires US, so that he/she can be relieved of all problems concerning custodial work. If you have any problems regarding your work, discuss them with your Supervisor, not with the Customer.

3.     When the customer or his/her employees are working late, it is because they have work to do; try not to disturb them.

4.     Exercise the utmost care while cleaning, to prevent <u>damage</u> to any of the customer's walls, doors, furniture, personal belongings, etc.

5.     You are expected to report to your Supervisor any breakage which may occur. This is important. DO NOT FAIL TO REPORT BREAKAGE.

6.     DO NOT CONSIDER ANYTHING NOT PLACED IN WASTE BASKETS AS TRASH UNLESS IT IS SPECIFI-CALLY MARKED "TRASH".  Any paper article found on the floor that is not obviously trash should be placed on a desk nearest to where it was found.



**36**

# IX

7.  You are to look to your Supervisor for instructions regarding cleaning. If a customer asks you to do something, politely inform the customer that you must notify your Supervisor immediately.

8.  Do not, under any circumstances, discuss the customer's business with anyone. To do so would violate the customer's trust in allowing us to enter the building.

9.  Never turn on music systems, radios or television sets. Do not turn on the air conditioning system.

10. You are not permitted to accept mail, telegrams, or messages for the customer.

## WORK HABITS

1.  You are not expected to "dress up" to perform your cleaning duties, but be neat and clean.  You should always be neatly groomed.  Wear the doublet/smock and/or uniform provided to you by the Company. No shorts or halter tops may be worn on the job. You must work in closed heel and toe shoes. No shorts or sandals are allowed.

2.  Whenever your Supervisor contacts you with instructions or helpful suggestions regarding the cleaning, pay attention and do what is requested immediately. He/she is only trying to please the customer and to help all of us to do our jobs better.

3.  Clean your equipment and storage areas nightly. Empty your vacuum nightly, and wipe off your machine and cord after each use.

4.  Smoking is not allowed while you are performing your cleaning duties. The danger of fire and dropping of ashes is too great. Smoking is allowed only in authorized and designated areas. Many of our buildings are "non-smoking." Check with your Supervisor on this policy.

5.  You are not permitted to leave your job during working hours without the approval of your Supervisor.

6.  For your personal safety, you are not permitted to play personal radios, with or without headphones, while working.



**37**

## NOTES

**P&R**
ENTERPRISES

38

# X ACKNOWLEDGMENT

I _____ hereby acknowledge I received a copy of P&R Enterprises, Inc.'s Company Handbook. I further acknowledge that I have read the Handbook or have had it read to me. I understand that this Handbook rescinds and replaces all previous handbooks. I will abide by all the policies, procedures, rules and regulations contained in the Handbook. I further understand that the Handbook is not an express or implied contract of employment nor does it create any rights in the nature of an employment contract. I understand that either P&R Enterprises, Inc. or I may terminate the employment relationship at any time and for any reason.

I agree to the search of my personal property as described in the Company Handbook.

I understand that the policies, procedures, rules, and regulations described in the Handbook may be changed from time-to-time without advance notice.

Dated: _____

By: _____

Print Name: _____

Employee Signature: _____

Witness Signature: _____

**P&R**
**ENTERPRISES**

**Form 1**

**P&R'S**
**DRUG-ALCOHOL POLICY**

I acknowledge receiving a copy of P&R's 2000 drug-alcohol policy. The policy has been explained to me. I understand:

- that P&R will reasonably accommodate me to the extent required by law, if I seek help for a drug or alcohol problem before I become subject to discipline or discharge under the policy;

- that I will be subject to mandatory testing for drugs and/or alcohol in the circumstances described in the policy; and

- that my compliance with the policy is a condition of my continued employment.

Employee signature_____

Date_____



**P&R**
**ENTERPRISES**            **40**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARLOS CASTILLO, et al.,    )    Case No. 07-cv-1195 (CKK)
    )
       Plaintiffs,    )
    )
v.    )
    )
P & R ENTERPRISES, INC.,    )
    )
       Defendant.    )
_____)

## DECLARATION OF JONI S. JACOBS IN SUPPORT OF MOTION FOR
## NOTICE TO SIMILARY-SITUATED EMPLOYEES

I, Joni S. Jacobs, declare as follows:

1.    I am an attorney at law licensed to practice before this Court and one of the attorneys of record for plaintiffs herein Carlos Castillo and Carlos Flores. I make this Declaration based on my own personal knowledge gained in the course of that representation. If called to testify to the statements made herein, I can and will competently testify to them.

2.    Attached hereto as Exhibit A are true and correct copies of the first page of Job Time Sheets Mr. Flores presented to counsel of record. I have redacted the Social Security Numbers of the employees listed on the job sheets.

3.    The Job Time Sheet for the payroll period September 16, 2006 to September 30, 2006, shows that Mr. Castillo was scheduled to work 48 hours during the seven-day period beginning on Saturday, September 16, 2006 and ending on Friday, September 22, 2006.

1

4.      Attached hereto as Exhibit B are true and correct copies of paystubs Mr. Castillo presented to me. I have redacted Mr. Castillo's Social Security Number to protect his privacy rights. These paystubs show that Mr. Castillo worked 112 hours during the 16-day pay period ending on August 31, 2006, and that he worked 136 hours during the 15-day pay period ending on September 16, 2006. All of his hours were paid at the straight-time rate of $11.25 per hour.

5.      The Job Time Sheet for the payroll period September 16, 2006 to September 30, 2006, shows that Mr. Flores was scheduled to work a total of 90 hours during the payroll period, including 50 hours during the seven-day period beginning on Saturday, September 23, 2006 and ending on Friday, September 29, 2007. The Job Time Sheet shows that no matter what seven-day period of time is used for Defendant P & R's workweek, as required by 29 C.F.R. § 778.105, during at least one workweek in this payroll period, Mr. Flores was scheduled to work more than 40 hours.

6.      The Job Time Sheet for the payroll period October 16, 2006 to October 31, 2006, shows that Mr. Flores was scheduled to work a total of 113 hours during the payroll period, including 48 hours during the seven-day period beginning on Saturday, October 21, 2006 and ending on Friday, September 27, 2006. The Job Time Sheet shows that no matter what seven-day period of time is used for Defendant P & R's workweek, as required by 29 C.F.R. § 778.105, during both workweeks in this payroll period, Mr. Flores was scheduled to work more than 40 hours.

7.      Attached hereto as Exhibit C are true and correct copies of paystubs Mr. Flores presented to counsel of record.  I have redacted Mr. Flores's Social Security Number to protect his privacy rights.  The originals of these documents are in my possession.  The paystubs show that Mr. Flores worked 90 hours during the 15-day pay period ending on September 30, 2006, which is the same number of hours he was scheduled to work on the Job Time Sheet for the corresponding payroll period.  The paystub shows that he was paid straight-time for all of these hours.

8.      The paystubs show that Mr. Flores worked 121 hours during the 15-day pay period ending on October 15, 2006., although he was scheduled to work 113 hours on the Job Time Sheet for the corresponding payroll period.  The paystub shows that he was paid straight-time for all of these hours.

9.      Attached hereto as Exhibit D is a true and correct copy of a collective bargaining agreement between Defendant and SEIU Local 82.  I obtained this document from an employee of SEIU Local 82, who represented that it was an accurate copy of what it purports to be.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _26th_ day of September, 2007, at Washington, DC.

_____
Joni S. Jacobs

3

# Job Time Sheet

**Job No.:** 1036
**Job Name:** 1401 H STREET, N.W./CITY CENTER

Handwritten note: **Septembre (2)**

| Job ID No. and Employee No. | Employee Name | Hire Date | 09/16/06 Saturday | 09/17/06 Sunday | 09/18/06 Monday | 09/19/06 Tuesday | 09/20/06 Wednes | 09/21/06 Thursda | 09/22/06 Friday | 09/23/06 Saturday | 09/24/06 Sunday | 09/25/06 Monday | 09/26/06 Tuesday | 09/27/06 Wednes | 09/28/06 Thursda | 09/29/06 Friday | 09/30/06 Saturday | 10/01/06 Sunday | Subtotal | Vacation Hours | Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1036001 Resident Alien | AVALOS, MILAGROS | 04/01/04 8.00 | X | X | 8 | 8 | 8 | 8 | 8 | X | X | 8 | 8 | 8 | 8 | 8 | X | X | 80 | X | 80 |
| 1036002 York Permit/VISA | PROJECT MANAGER | 06/12/09 8.00 | X | X | 5 | 5 | 5 | 5 | 5 | X | 8 | 5 | 4.5 | 4.5 | 4.5 | 5 | X | X | 105 | X | 105 |
| SUPERVISOR | DURADO, FRANCISCO | 02/27/01 4.50 | X | X | 8 | 8 | 8 | 8 | 8 | X | 8 | 9 | 8 | 8 | 9 | 8 | X | X | 90 | X | 90 |
| 1036004 Resident Alien | FLORES, CARLOS I. | 09/09/06 10/02/06 | X | X | X | X | X | X | X | X | X | 5 | X | X | X | A | 5 | X | 46 | X | 46 |
| 1036005 Resident Alien | MARA-ABREU, RAMO | 08/01/06 8.00 | X | X | 5 | 5 | 5 | 5 | 5 | X | X | 6 | X | X | A | A | 5 | X | 46 | X | 46 |
| DAY PORTER | FLORES, NOEMI | 06/22/11 8.00 | X | X | 3 | 3 | 3 | 3 | 3 | X | X | 3 | 3 | 3 | 3 | A | 3 | X | 27 | X | 27 |
| 1036009 Resident Alien | FLORES, NOEMI | 12/11/10 01/28/94 5.00 | X | X | 6 | 6 | 6 | 6 | 6 | X | X | 6 | 6 | 6 | 6 | 6 | X | X | 60 | X | 60 |
| 1036010 Resident Alien | SANCHEZ, MARIA L | 08/16/91 3.00 PAID | X | 8 | 8 | 8 | 8 | 8 | 8 | X | X | P | PR | M | I | 50 | X | X | 48 | X | 48 |
| 1036011 Day Cleaner | CASTILLO, CARLOS A | 12/11/89 6.00 | X | X | 6 | 6 | 6 | 6 | 6 | X | X | 7 | 7 | 6 | 7 | 6 | X | X | 63 | X | 63 |
| 1036012 Resident Alien | LIZAMA, MARIA INES | 03/27/03 11/19/12 8.00 / 6.00 | | | | | | | | | | | | | | | | | | | |

**EXHIBIT A**

# Job Time Sheet

**Job No.:** 1036

**Job Name:** 1401 H STREET, N.W./CITY CENTER

Octubre (2)

October 9, 20   1:06 PM
Page   7
ASTRID

| Employee Name / Job ID No. and Employee No. | Hire Date | Mon 10/16/06 | Tue 10/17/06 | Wed 10/18/06 | Thur 10/19/06 | Fri 10/20/06 | Sat 10/21/06 | Sun 10/22/06 | Mon 10/23/06 | Tue 10/24/06 | Wed 10/25/06 | Thur 10/26/06 | Fri 10/27/06 | Sat 10/28/06 | Sun 10/29/06 | Mon 10/30/06 | Tue 10/31/06 | Subtotal | Vacation | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZAVALOS, MILAGROS — 1036001 — Resident Alien — DAY CLEANER | 04/01/04 | 6 | 6 | 6 | 6 | X | X | 6 | 6 | 6 | 6 | 6 | X | X | 6 | 6 | X | 72 |  |  |
| CURADO, FRANCISCO — 1036002 — Work Permit/VISA — PROJECT MANAGER | 06/12/09 | PE | RM | I | SO | 0 | X | P | ER | M | I | 50 | X | X | Perm 50 | Perm 50 | X | X |  |  |
| FLORES, CARLOS I. — 1036004 — Work Permit/VISA — SUPERVISOR I | 09/09/06 02/27/01 04:50 | 6 | 6 | 6 | 6 | 6 | X | 6 | 6 | 6 | 6 | 6 | X | X | A | 6 | X | 66 |  |  |
| FLORES, NOEMI — 1036005 — Resident Alien — DAY CLEANER | 10/02/06 | P | ER | M | 5 | 0 | X | 3 | 3 | 3 | 3 | 3 | X | X | 3 | 3 21 | X | 21 |  |  |
| LARA-ABREU, RAMO — 1036005 — Resident Alien — DAY PORTER | 06/22/11 | P | ER | M) | 5 | 0 | X | 5 | 5 | 5 | 5 | 5 | X | X | 5 | 5 35 | X | 35 |  |  |
| FLORES, NOEMI — 1036008 — Resident Alien — DAY CLEANER | 02/23/08 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |  |  |
| SANCHEZ, MARIA L — 1036009 — Resident Alien — MAID | 08/01/06 | 8 | 8 | 8 | 5 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | X | 8 | 9 | 8 113 | M3 |  |  |
| CASTILLO, CARLOS A — 1036010 — Resident Alien — DAY CLEANER | 12/11/10 01/28/94 | 5 | 5 | 5 | 5 | 5 | X | 5 | 5 | 5 | 5 | 5 | 5 | X | X | 5 | 5 60 | X | 60 |  |
| LIZAMA, MARIA INES — 1036011 — Work Permit/VISA — DAY CLEANER | 12/11/89 12/11/10 | 8 | 8 | 8 | 5 | 8 | X | 8 | 8 | 8 | 8 | 8 | 8 | X | X | 8 9 | 8 96 | X | 96 |  |
| — 1036012 — Resident Alien — DAY CLEANER | 09/25/08 03/09/05 11/19/12 03/27/03 | 6 | 6 | 6 | 6 | 6 | X | 6 | 6 | 6 | 6 | 6 | 6 | X | X | 6 | 6 72 | X | 72 |  |

**P&R ENTERPRISES, INC.**

**CARLOS A CASTILLO 1036011**
SSN: ██████████

**Pay Period End Date:** 08/31/06 September 11, 200 Check No.  195653

| Earnings | Job No. | Hours | Rate | This Check |
|---|---|---|---|---|
| Regular Hourly Pay | 1036 | 112.00 | 11.25 | 1,260.00 |
| **Total Earnings** | | | | **1,260.00** |

| Gross to Net Pay | This Check | YTD Amount | Balance |
|---|---|---|---|
| Total Earnings | 1,260.00 | 18,100.28 | |
| Social Security-Employee | -78.12 | -1,122.23 | |
| Medicare-Employee | -18.27 | -262.47 | |
| Federal Income Tax | -54.00 | -510.68 | |
| District of Columbia Tax | -61.34 | -760.76 | |
| **Net Pay** | **1,048.27** | **15,444.14** | |

| Net Pay Distribution | Amount |
|---|---|
| Pay Check | 1,048.27 |

**P&R ENTERPRISES, INC.**

**CARLOS A CASTILLO 1036011**
SSN: ██████████

**Pay Period End Date:** 09/15/06 September 25, 200 Check No.  197124

| Earnings | Job No. | Hours | Rate | This Check |
|---|---|---|---|---|
| Regular Hourly Pay | 1036 | 136.00 | 11.25 | 1,530.00 |
| Vacation Pay | 1036 | 40.00 | 11.25 | 450.00 |
| **Total Earnings** | | | | **1,980.00** |

| Gross to Net Pay | This Check | YTD Amount | Balance |
|---|---|---|---|
| Total Earnings | 1,980.00 | 20,080.28 | |
| Social Security-Employee | -122.76 | -1,244.99 | |
| Medicare-Employee | -28.71 | -291.18 | |
| Federal Income Tax | -162.00 | -672.68 | |
| District of Columbia Tax | -129.74 | -890.50 | |
| **Net Pay** | **1,536.79** | **16,980.93** | |

| Net Pay Distribution | Amount |
|---|---|
| Pay Check | 1,536.79 |



EXHIBIT

ß

**CARLOS I. FLORES 1036004**
SSN:
                                    **P&R ENTERPRISES, INC.**
                        Pay Period End Date: 09/30/06 October 10, 2006  Check No.   198767

| Earnings | Job No. | Hours | Rate | This Check |
|---|---|---|---|---|
| Regular Hourly Pay | 1036 | 90.00 | 10.10 | 909.00 |
| | | | | |
| **Total Earnings** | | | **909.00** | |

| Gross to Net Pay | This Check | YTD Amount | Balance |
|---|---|---|---|
| Total Earnings | 909.00 | 15,623.30 | |
| Social Security-Employee | -56.36 | -968.69 | |
| Medicare-Employee | -13.18 | -226.56 | |
| Federal Income Tax | -57.57 | -965.17 | |
| Maryland State Tax | -65.64 | -259.34 | |
| Child Support | -106.25 | -1,912.50 | |
| **Net Pay** | **610.00** | **11,291.04** | |

| Net Pay Distribution | Amount |
|---|---|
| Pay Check | 610.00 |

**CARLOS I. FLORES 1036004**
SSN:
                                    **P&R ENTERPRISES, INC.**
                        Pay Period End Date: 10/31/06 November 9, 2006 Check No.   301098

| Earnings | Job No. | Hours | Rate | This Check |
|---|---|---|---|---|
| Regular Hourly Pay | 1036 | 121.00 | 10.10 | 1,222.10 |
| | | | | |
| **Total Earnings** | | | **1,222.10** | |

| Gross to Net Pay | This Check | YTD Amount | Balance |
|---|---|---|---|
| Total Earnings | 1,222.10 | 18,219.00 | |
| Social Security-Employee | -75.77 | -1,129.62 | |
| Medicare-Employee | -17.72 | -264.20 | |
| Federal Income Tax | -102.90 | -1,193.69 | |
| Maryland State Tax | -90.53 | -452.45 | |
| Child Support | -106.25 | -2,125.00 | |
| **Net Pay** | **828.93** | **13,054.04** | |

| Net Pay Distribution | Amount |
|---|---|
| Pay Check | 828.93 |



EXHIBIT

C

# COLLECTIVE BARGAINING AGREEMENT

## Between

## SERVICE EMPLOYEES INTERNATIONAL UNION
## LOCAL 82

### And

## DISTRICT OF COLUMBIA
## COMMERCIAL OFFICE BUILDING CLEANING CONTRACTORS

**START:**          **May 1, 2003**

**EXPIRATION:**          **April 30, 2008**

ORIGINAL



1

**AGREEMENT**

This Agreement, dated as of May 01, 1993 by and between Service Employees International Union, Local 82, AFL-CIO. Hereinafter called the "Union" and the signatory Employers listed (hereinafter called the "Employer.")

**ARTICLE 1**
**RECOGNITION**

Section 1.  The Employer recognizes the Union as the exclusive bargaining agent for its janitorial employees (including lead janitors) excluding supervisors, clerical or guards employed at any commercial office building within the District of Columbia, subject to the procedures outlined in Appendix A of this Agreement.

**ARTICLE 2**
**WAGES**

Section 1.  The wage rates and economic benefits contained in the parties' 1997-2003 collective bargaining agreement shall remain in effect through December 31, 2003.  Effective January 1, 2004 all employees covered by this Agreement shall receive fifty cents per hour ($.50) wage increase or shall go to the rates listed below, whichever gives the employee the highest rate of pay.  Thereafter, each employee will go to the appropriate wage schedule below every January 1st through the term of the contract.

| Classification | 5/1/03 | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/108 |
|---|---|---|---|---|---|---|
| Day Porter | $8.80 | $9.30 | $9.70 | $10.10 | $10.55 | $11.00 |
| Full Time Cleaner | $8.50 | $9.00 | $9.40 | $9.80 | $10.25 | $10.70 |
| Part Time Cleaner | $8.00 | $8.50 | $8.90 | $9.30 | $9.75 | $10.20 |
| Lead | 0.25 over above listed rates | | | | | |

Section 2.  All employees hired after the dates listed above shall be paid the rate listed above.

Section 3.  An employee called in to work on a regularly scheduled day off shall be guaranteed a minimum of four (4) hours of pay.

Section 4.   The decision to assign an employee to the Lead Classification or to remove an employee from the Lead Classification shall rest within the sole discretion of the Employer. The Employer agrees that any employee designated as a Lead or removed from the Lead classification shall be so notified in writing.

2

## ARTICLE 3
## HOURS OF WORK

Section 1. All work performed in excess of forty (40) hours in any workweek by employees shall be considered overtime and shall be compensated for at the rate of time and one-half of the prevailing rate of pay for such job.

Section 2. If overtime requirements cannot be met on a voluntary basis, it shall be assigned in order of reverse seniority where practical consistent with the employee's ability to perform the job. No overtime shall be worked except by direction of supervisory personnel of the Employer. Any error in assignment will be corrected with an additional overtime opportunity for the affected employee.

Section 3. The Employer agrees to correct any payroll error as soon as possible and make every effort to do so by the next pay period.

Section 4. Employees working shifts of six (6) hours or more will receive an unpaid break of thirty (30) minutes.

Section 5. An employee who is regularly scheduled for thirty-five (35) hours or more per week shall be considered a full time employee.

Section 6. Effective January 1, 2004, all employees scheduled to work will be scheduled a minimum 4 hours per shift. Effective 1/1/05, all employees scheduled to work in buildings of 100,000 square feet and higher will be scheduled a minimum 5 hours per shift /25 hours per week. Effective 1/1/07, all employees scheduled to work in buildings of 500,000 square feet and higher will be scheduled a minimum 6 hours per shift/ 30 hours per week.

Section 7. The Employer agrees that effective upon the signing of this agreement, any newly constructed or fully renovated buildings of 500,000 square feet and higher that opens will be bid at 6 hours. Any location of 500,000 square feet or more that becomes covered by this Agreement after the effective date shall be bid at 6 hours.

Section 8. The Union and the Employer agree to work with building owners who own buildings of less than 500,000 square feet who wish to increase hours to 6 hours or higher.

Section 9. Employees who request a transfer to a building with a 5 or 6-hour shift will be awarded such transfers on a seniority basis. The Employer shall maintain a list of employees who request a job with increased hours. If no employee has requested to fill an opening in a building with a 5 or 6 hour shift, the employer may hire from the outside to fill vacancies.

Section 10. To the extent possible, the reduction in the number of employees caused by the increase in hours shall be accomplished by attrition. The Union and the Employer agree to work to accommodate particular location problems on a case-by-case basis.

Section 11. Within 6 months of the signing of this agreement, the Employer will provide the Union with its plan to meet this commitment.

3

## ARTICLE 4
## HEALTH AND WELFARE

Section 1. Full-Time Worker Coverage:  The Employer agrees to provide single health coverage to each employee scheduled to work thirty - five (35) hours or more per week at no cost to the employee who has completed six (6) months of continuous employment

Section 2. The Employer agrees that such coverage shall be comparable to the single health coverage in the SEIU Plan IV with Standard Prescription Drug Card and Dental/Vision. The maximum amount the Employer will pay to the SEIU Health and Welfare Fund per month per eligible employee for such single insurance coverage is as follows:

| Effective 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|
| $211.00 | $235.00 | $255.00 | $280.50 | $308.50 |

Section 2. Part-Time Worker Coverage: The Employer shall contribute to a health and welfare trust fund that is jointly administered by the parties and that will be determined by January 1, 2004, the following amounts per paid hour on behalf of all part-time employees who work less than thirty –five (35) hours per week:

| Effective 1/01/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|
| $.10 | $.20 | $.30 | $.40 | $.50 |

Section 3. Effective January 1, 2005 health insurance will be provided to the 750 most senior part-time employees who work less than 35 hours per week.  In order to be eligible, these most senior employees who are selected must not be covered under another comparable health insurance plan from another job, a spouse or a public program.  Seniority for purposes of this benefit only, shall be based on the employee's length of continuous service with an Employer or Employers who are signatory to this Agreement or its predecessor.

Section 4. A Committee representing both parties will be formed to work with the jointly administered health and welfare trust fund referenced in this Article to explore options for a healthcare program which best meets the needs of the employees given the money made available by the contributions required by this Article. The Committee will also design a system by which bargaining unit seniority for purposes of this provision is tracked and health insurance eligibility is determined.

4

## ARTICLE 5
## PAID HOLIDAYS

Section 1.  The Employer shall grant to all employees the following holidays off with pay:

| | | |
|---|---|---|
| New Year's Day | Independence Day | Martin Luther King's Birthday |
| Labor Day | President's Day | |
| | | Thanksgiving Day |
| Memorial Day | Christmas Day | |

Section 2.  An employee required working on Martin Luther King Day or Presidents Day should be offered another day off with pay.  An employee required to work on any of the other holidays listed above shall be given holiday pay plus straight time for hours worked.

Section 3.  When a legal holiday covered by this Agreement falls on an employee's day off, same shall be compensated for at straight time hourly rate of pay or in lieu thereof, the employee shall receive a day off with pay within a period of two weeks following such holiday. The Employer agrees the requested day off shall not be unreasonably denied.

Section 4.  In order to be eligible for holiday pay, an employee must work all his/her scheduled hours on the workday before and after the holiday unless he/she is on excused absence.

Section 5.  The Employer shall post in the office at the work site a list of the holidays observed by the building.

## ARTICLE 6
## VACATIONS

Section 1. Part time employees covered by the Collective Bargaining Agreement in effect between 1993 and 1999 and continuously employed since before January 1, 1999 shall receive vacation in accordance with the following schedule: one (1) week of vacation with pay after completion of one (1) year of continuous employment; two (2) weeks of vacation with pay after completion of two (2) years of continuous employment; three (3) weeks of vacation with pay after completion of five (5) years of continuous employment;  and four (4) weeks of vacation with pay after completion of fifteen (15) years of continuous employment,-  All other part time employees shall receive one (1) week of paid vacation per year after completing one (1) year of continuous employment and two (2) weeks of paid vacation after four (4) years of continuous employment unless the Employer's current vacation policy exceeds this schedule.

5

Full time employees shall receive vacation in accordance with the following schedule unless the Employer's current vacation policy exceeds this schedule:
one (1)week of paid vacation after completion of one (1) year of continuous employment; two (2) weeks of paid vacation after completion of two (2) years of continuous employment; three (3) weeks of vacation with pay after completion of five (5) years of continuous employment; four (4) weeks of vacation with pay after completion of ten (10) years of continuous employment.

**Section 2.** It is agreed that the employee's vacation shall be paid at the current rate of pay. Vacation pay is to be given to the employee on the payday preceding the week that the vacation begins if requested.

**Section 3.** When a holiday occurs during the employee's vacation, the employee shall be entitled to an extra day vacation or at the option of the Employer, an extra day's wage. The Employer will not unreasonably deny the employee's request.

**Section 4.** The Employer agrees to pay all employees for all unused vacation upon separation on the next practical payday. The amount of vacation pay is pro-rated based on the amount of service since the last anniversary day of the employee.

**Section 5.** Vacation time can be used for extended sick leave or funeral leave provided the employee has used up his/her accrued sick leave and provided he/she provides a doctor's documentation when requested by the Employer.

**Section 6.** The employee's request for vacation leave shall not be unreasonably denied. Where there is a conflict with current workloads because the Employer receives simultaneous requests from two or more employee for vacation on the same day, seniority will prevail.

**Section 7.** When the Employer takes over a Union contractor's account, the Employer will recognize seniority, past service, and earned vacation. The outgoing contractor shall pay the pro-rated vacation pay that is due with the last payroll check. The successor Employer shall pay the balance due at the time the vacation is accrued and taken and shall recognize and grant the full time off that is due.

**Section 8.** If a building is closed due to circumstances beyond the workers' or contractors' control due to weather or other emergency, the employees shall have the right to use accrued vacation time.

## ARTICLE 7
## LENGTH OF SERVICE

**Section 1.** The employee's length of service shall be computed from the date on which he/she is hired by the Employer or date of employment in the building, whichever is longer. The employee or the Union shall provide verification that the employee was continuously employed at the building. Seniority, by classification, shall be the sole factor in determining the employees' layoff and recall order. One shop steward per shift shall have super seniority.

Section 2.  The Employer shall maintain a posted seniority list on the bulletin board. Conflicts in seniority dates shall be resolved through the grievance procedure.

Section 3.  Employees hired in locations covered by this Agreement shall be on probation for ninety (90) days during which time the employee may be discharged without recourse to the grievance procedure of this Agreement, provided that no employee hired as a result of acquiring a location covered by this Agreement shall be subject to this Section.

Section 4. When an employee presents satisfactory evidence of a legal name change or a mistake with respect to the social security number initially provided to the Employer, the Employer shall modify its records to reflect the name or social security number change and the employee's seniority will not be affected.


# ARTICLE 8
## SICK LEAVE

Section 1.  All employees continuously employed since before January 1, 1999 and covered by the Agreement before January 1, 1999 shall be granted six (6) days of sick leave with pay per year earned at the rate of one-half (1/2) day per month.  Employees will be eligible to use accrued leave after thirty (30) days of employment.  In all cases of illness in excess of two (2) consecutive working days a physician's certificate or other acceptable evidence of disability will be submitted by an employee as claim for sick leave benefits, if requested by the Employer.

Section 2.  Employees covered by this Agreement before January 1, 1999 may accrue a maximum of twelve (12) days sick leave.

Section 3.  After six (6) months of employment all full time employees covered by this Agreement on or after January 1, 1999 shall begin to accrue paid sick leave at the rate of one-half (1/2) day per month up to the maximum of six (6) days.  The employee must use two (2) days per incident to be eligible for paid sick leave.  A doctor's certificate shall be required upon return to work, if requested by Employer

Section 4.  After one (1) year of employment with the Employer, all part time employees not covered by Section 1 above shall be entitled to three (3) days of paid sick leave per year. Accrued sick leave for part time employees may not be carried over from year to year.

Section 5.  Vacation time can be used for extended sick leave provided the employee has used up his/her accrued sick leave and provided he/she provides documentation when requested by the Employer.

Section 6.  All employees must give two (2) hours notice before the beginning of the shift in order to claim sick leave benefits.  The Employer agrees to maintain a call-in system and daily log.

## ARTICLE 9
## UNION SECURITY AND CHECK-OFF

Section 1.  All employees covered by this Agreement at the time it becomes effective and who are members of the Union at that time shall be required as a condition of employment to remain members by the timely payment of all dues and initiation fees in the Union.  Employees covered by this Agreement who are not members of the Union shall be required as a condition of employment to become members of the Union within thirty (30) days after the effective date of this Agreement or thirty (30) days after their employment and remain members by the timely payment of all dues and initiation fees in the Union.  The Employer will execute the terms of this article within 5 days after the Union notifies the Employer that the employee is not a member in the Union.

Section 2. The Employer shall notify the Union steward or Union office by the end of the following pay period of the name and occupation of new or additional employees hired.

Section 3.  The Employer shall deduct initiation fees, monthly dues and COPE contributions and credit union contributions from the first paycheck of each month on the basis of individually signed authorization cards and remit to the Secretary Treasurer of the Union within five (5) days after they were deducted from the Employee.  The employer shall provide the Union office each month along with the check for the Union dues a full list of employees covered by this Agreement.  The list should be provided by building with the employee's name, address, last 4 digits of social security number, date of birth, date of hire, and or termination date, and Union deduction if made.  Additionally, if feasible, the employer shall provide this list electronically, or in a floppy disk in an excel file to the Union office each month.

Section 4.  The Employer agrees to provide all new employees with a Check-off Authorization Form as provided by the Union on the date of employment and request that the employee sign the card.  A copy of the card shall be sent to the Union with the monthly Check-off.

Section 5.  The Union agrees to hold the Employer harmless and indemnified against any and all claims, liability or fault arising out of the Employer's compliance with this Article.

## ARTICLE 10
## FUNERAL LEAVE

Section 1.  All part time and full time employees that have six (6) months or more of continuous employment covered by this Agreement shall be granted three (3) days paid leave due to the death of a spouse, father, mother, son, daughter, brother or sister.  The Employer may request proof of death or funeral certificate. Employees who have to travel to distant locations because of the death of immediate family members as defined above, may be granted an excused unpaid leave of absence for up to thirty (30) calendar days (in addition to paid funeral leave provided above).  The employee shall notify the Employer of his/her exact date of return to work.  The Employer shall not unreasonably deny such leave.

## ARTICLE 11
## DISCHARGE AND DISCIPLINE

Section 1.  It is agreed that each party shall treat the other with mutual respect and dignity and that the employer shall only discharge or discipline employees for just cause.  The Employer agrees to use progressive discipline.  Discipline must be given in writing within two (2) working days of the offense.  Where feasible and appropriate, disciplinary notices will be provided in Spanish as well as English, but the English version shall control.  Copies of all warning or disciplinary notices will be given to the Shop Steward, if available, within three (3) working days of their issuance.  If no shop steward is available, the employee will be given an extra copy of the warning notice to provide to the Union if the employee so chooses.  It is also agreed that all work shall be of a standard approved by the Employer.  Work, which is not up to the standard set by the Employer, shall subject the employee performing such work to discipline.

Section 2.  The Shop Steward or other Union representative shall be a present at all disciplinary meeting of employees involving written disciplinary action if requested by the employee.  Where feasible and appropriate, the meeting will be rescheduled if a shop steward or other union representative is not available and will be conducted in Spanish.

Section 3.  All employees shall have the right to have a steward or other union representative present at any investigatory meeting that the employee reasonable believes might lead to discipline.  The employee must request the steward to be present.

Section 4.  All written disciplinary warnings shall be removed from the employees file after eighteen (18) months and cannot be used thereafter as part of the disciplinary procedure.

## ARTICLE 12
## GRIEVANCE PROCEDURE

Section 1.   It is agreed that any dispute arising out of this Agreement between an employee or the Union and the Employer shall use the procedure set out below.  Time limits in the Article shall exclude Saturday, Sunday and paid holidays.  The Employer shall provide the Union with the names of their appropriate designated Employer representative to receive all written notices.

Step 1.  The employee and the immediate supervisor shall attempt to resolve any differences at the time they arise.  In the event they are unable to resolve the issue, the employee shall request a meeting with the supervisor and the shop steward to attempt to resolve the issue.  If they are unable to resolve the issue, the grievance shall be reduced to writing and submitted to the Employer's designated representative within five (5) days of the incident-giving rise to the grievance or the grievance shall be deemed resolved.

Step 2.  Any grievance other than a suspension or termination shall be heard at a monthly meeting of the Union and Employer.  If they are unable to resolve the issue, the Union shall notify the Company in writing within five (5) days of the Step 2 Monthly meeting that the grievance will be move to Step 3.  For all suspensions, the representative of the Company, the employee and the Union Representative shall meet within five (5) days of receipt of the Step 1 notice to try to

9

resolve the issue. If they are unable to resolve the issue, the Union shall notify the Company in writing within five (5) days of the Step 2 meeting that the grievance will be moved to Step 3

Step 3.  Within five (5) days of receipt of the notice from Step 2, the Union Representative and employee shall meet with the designated Employer representative or his/her designee.

Step 4.  If the grievance is not resolved at Step 3, it may be submitted at the request of either party to an Arbitrator whose decision shall be final.  The Union shall notify the Employer in writing within five (5) days of the Step 3 meeting of its intention to advance the grievance to arbitration or it shall be deemed resolved. All expenses of arbitration shall be equally borne by both parties, except that each party shall pay any expenses of its attorneys, representatives and witnesses.

Section 2. The Union may advance a grievance to arbitration either by providing to the Employer a list of acceptable arbitrators or by notifying the Federal Mediation and Conciliation Service (FMCS) within five (5) days of the Step 3 meeting.  If the Union provides the Employer with a list of acceptable arbitrators, the Employer shall have five (5) days to notify the Union if one of the arbitrators is acceptable.  If the Employer does not select an arbitrator within five (5) days of the Employer's receipt of the Union list, the Union shall notify the FMCS no later than ten (10) days from the Step 3 meeting and both parties agree to strike names to determine the choice of an arbitrator.  If either party wishes to reject the entire list of arbitrators from the FMCS, said party shall notify the other party within five (5) days of receipt of the list.   In that event, a new list shall be requested of FMCS.

Section 3.  The arbitrator shall rule only on the grievance being heard and shall have no authority to change or alter any terms of this agreement.

Section 4.  The Employer shall have the right to initiate grievances.  Employer grievances shall be initiated at Step 3 and must be submitted to the Union in writing within five (5) days of the incident giving rise to the grievance.

Section 5.  Grievances over discharge of an employee shall be initiated at Step 3 and must be submitted in writing to the Employer within five (5) days of the discharge.


## ARTICLE 13
## NO STRIKE AND NO LOCKOUT

Section 1.  The Employer agrees there will be no lockout of the employees and the Union agrees there will be no strikes, no work stoppages, slowdowns or similar forms of interference of work for any reason whatsoever for the term of this Agreement.


## ARTICLE 14

## LAY-OFF AND RECALL

Section 1. The Employer agrees to notify the Union at the earliest date possible in the event of lay-off. The Employer further agrees that all lay-off will be in reverse order of seniority by classification within a location and all recalls shall be in order of seniority by classification within a location.

Section 2. All employees laid off shall remain on the layoff list for up to one year after which their recall rights and seniority will terminate.

## ARTICLE 15
## UNION RIGHTS

Section 1. The Union shall have access to Union members and the right to investigate work conditions. The Union will utilize before and after hours so as not to interfere with the Employer's operation. The Employer will provide space for the Union to meet with Union members at the work site during non-working hours to handle grievances unless mutually agreed to with management.

Section 2. The Employee shall have the right to inspect their personnel file in the presence of an Employer representative.

Section 3. The Employer shall provide space for Union literature in a place convenient for employee use at the work site. All literature posted shall be official Union documents from the Union.

Section 4. Stewards shall obtain permission of their supervisor before leaving their work site and shall report back to their supervisor upon return to the work site. Upon entering the work site of another supervisor's responsibility, the Steward will contact the supervisor before contacting any employee.

Section 5. The Union shall have the right to inspect the employer's payroll and other relevant employment records upon reasonable notice and as it relates to specific grievances.

Section 6. An employee may request a leave of absence to work for the Union and the Employer may deny such a request.

Section 7. Shop stewards shall be notified by the supervisor of all terminations and new employees and shall be given an opportunity before or after working hours to meet with new employees to provide information on the Union.

Section 8. The Employer agrees to release one shop steward per building per shift two (2) times per year during the work hours without pay for shop steward training classes upon written notice from the Union of at least ten working days.

11

## ARTICLE 16
## DISCRIMINATION

Section 1. The Employer will not discriminate in employment, hiring, promotion, training or work assignment on the basis of race, creed, color, national origin, age, sex, sexual orientation, religion, mental or physical handicap, Union membership or Union activity or family relationship in accordance with all applicable laws.

Section 2. No employee shall be subject to sexual harassment. The Employer agrees to investigate and take immediate and appropriate action upon becoming aware of sexual harassment or allegations of sexual harassment.

Section 3. Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when such conduct is directed toward an individual because of that individual's gender.

Section 4. Grievances arising under this Article shall be subject to the Grievance Procedure through Step 3. If the Union advances a grievance arising under this Article to arbitration, the employee on whose behalf the grievance is arbitrated shall waive his or her right to pursue his or her claim in any federal or local court or agency and the employee shall accept the decision of the arbitrator as a final and binding ruling on his or her claim.

## ARTICLE 17
## MANAGEMENT RIGHTS

Section 1. The management of the Company's affairs and the direction of its working force, including but not limited to the right to establish new jobs, abolish or change existing jobs, change materials, processes, products, equipment in operations; schedule and assign work; hire, discipline and discharge for cause, transfer or layoff employees because of the lack of work, establish work rules; determine work loads, standards of quality of performance, hiring methods and practices; assignment and transfer of employees and the promotion of employees, establish, abolish or change bonus, incentive and quality programs shall be vested exclusively in the Company.

## ARTICLE 18
## UNPAID LEAVES OF ABSENCE

Section 1. The Employer agrees to comply with the DC Family and Medical Leave Act and the DC Parental Leave Act as they may be from time to time amended and interpreted. A summary of these statutes is included in this Agreement as Appendix C. In the event an employee has a grievance arising under either of these statues, the grievance will be subject to arbitration in accordance with Article 12, provided that, in advance of the arbitration, the employee and Union execute a waiver of the employee's right to pursue the same claim before any administrative agency, DC or federal court, and the employee shall accept the decision of the arbitrator as final and binding. It is understood that the purpose of this waiver is to allow the employee to elect the forum in which he or she chooses to pursue the claim, but to avoid duplicative procedures.

Section 2.  An employee may request an unpaid leave of absence for the reasons listed below, and the Employer may grant or deny the request, but no request shall be unreasonably denied.  The leave of absence, if granted, will be reduced to writing with a date for starting and ending.  If the employee does not return on the agreed upon date it will be deemed the employee has resigned.  The employee will return to their current or equivalent position without loss of seniority.  The payment of health insurance after thirty (30) days shall be the responsibility of the employee.  The Company will grant leaves of absence for the reasons listed below when requested in writing by the employee at least two (2) weeks in advance.  Emergency Leave shall not be unreasonably denied.

| | |
|---|---|
| Compassionate/personal leave: | Up to six months for the care of another person upon submission of appropriate documentation. |
| Medical leave: | Up to six months for medical reasons with documentation stating the employee may return to work without limitations to assume full duties. |
| Military leave: | As required by federal law |
| Civic leave: | For any employee who is required to report for jury service or to testify in any legal proceeding as a result of a subpoena, a copy of which shall be supplied to the Employer upon request. |

Section 3  For leaves of absence taken in accordance with Section 2 of this Article, the Employer agrees that an employee will be allowed to return to work at the end of the leave period.  For leaves of absence of one (1) month or longer, the employee will notify the Employer ten (10) days in advance of the scheduled date of return to work.  Should the employee require less leave time than originally agreed, the employee shall have the right to return ten days after notifying the Employer of his/her new return date.

## ARTICLE 19
## HEALTH & SAFETY

Section 1.  The Union and the Employer shall cooperate towards the objective of creating a safe and healthy work place for all employees and shall comply with all federal, state and local laws relating to health and safety.

Section 2.  The Employer shall provide an annual right to know training for every employee including, but not limited to training on infectious and hazardous waste, hazardous substances used or present in the work place and proper safety procedures for all employees.

13

Section 3. The Employer will provide all supplies, including gloves, goggles or other necessary safety equipment free to charge. The Employer will provide, repair and maintain all equipment needed to perform the job in a safe and efficient manner free of charge.

Section 4. The Employer shall have available upon request copies of OSHA 200 logs.

Section 5. The Employer shall maintain workers compensation coverage for all employees. The Employer shall post the required notice of workers compensation in a prominent and visible location to employees containing the name of the insurance company, its address and phone number.

Section 6. The Employer shall provide appropriate snow gear and equipment to employees who clear snow.

## ARTICLE 20
## IMMIGRATION

Section 1. The Employer agrees to work with all legal immigrants to provide the opportunity to gain either extensions continuations or other status required by the Immigration and Naturalization Service without having to take a leave of absence. If a leave of absence is necessary, the Employer agrees to give permission for the employee to leave for a period of up to ninety (90) days and return the employee to work with no loss of seniority provided the Employer is still in the building. All of the above shall be in compliance with existing laws.

Section 2. A "no match" letter from the Social Security Administration (SSA) shall not itself constitute a basis for taking any adverse employment action against an employee or for requiring an employee to re-verify work authorization. Upon receipt of such a letter, the Employer shall notify the employee and provide the employee with a copy of the letter and inform the employee that he or she should contact SSA.

## ARTICLE 21
## UNION LIAISON

Definition:  Union Liaison—a Union Representative, (Usually taken off the job from the Employer on unpaid leave of absence) who will be responsible for conducting contract compliance (grievance adjudication, etc...), distribution of union information, and conducting worksite meetings. This will normally occur where no Shop Stewards exist.

Section 1. The Union shall designate and the Employer shall permit the designated employee to be excused from work for up to 1040 hours per year without pay and benefits but with no loss of seniority to serve as the Union Liaison. The Union Liaison shall be assigned to the administration of this Agreement. The Union may designate one Liaison for every 100 employees or 1 Liaison for every 10 buildings per employer covered by this Agreement. Such designations shall be in writing and approved by both the Union and the Employer. The employee shall not accrue seniority during this leave.

14

**Article 22**
**TRAINING AND EDUCATION FUND**

Section 1.  The Employer agrees to provide all employees covered by this Agreement with benefits under the Local 82 Service Employees Training and Education Fund (hereinafter "Fund").

Section 2. The Employer agrees to become and remain a participating employer in the Fund throughout the term of this Collective Bargaining Agreement, including any extensions thereof.

Section 3.  Contributions: The Employer agrees to contribute to the Fund $0.05 per paid hour for all employees covered by this Agreement.

Section 4.  Contributions required by this provision shall be made to the Fund on or before the fifteenth (15th ) day of each month for hours paid in the preceding month or on or before such other date as the Trustees may hereafter determine.

Section 5.  Contributions shall be transmitted together with the remittance report containing such information in such manner on such form as may be required by the Trustees of the Fund.

Section 6.  The Employer agrees to be bound by the provisions of the Agreement and Declaration of Trust establishing the Fund as it may from time to time be amended and by all resolutions and rules adopted by the Trustees pursuant to the power delegated to them by that Agreement, including collection policies. The Employer hereby designates the Employer members of the Fund' Board of Trustees or their duly selected successor(s) as its representatives on the Board.

Section 7.  The Employer and the Union agree to cooperate with the Trustees of the Fund in distributing Plan Booklets, literature and other documents supplied by the Fund and in obtaining and providing such other data as may be required by the Fund.

**ARTICLE 23**
**LABOR-MANAGEMENT COMMITTEE**

Section 1.  The Employer and the Union agree to conduct an annual joint training outside of normal working hours of all supervisors and shop stewards for the purpose of improving the administration of this Agreement and ensuring the highest quality of service to tenants, building management and other interested parties of such services as cleaning, security and other services required by the industry.

15

## ARTICLE 24
## WORK PRESERVATION

In order to protect and preserve the work covered by this Agreement, the Employer agrees that if it or its principals, under the Employer's name or another name, subsequently employ employees in the District of Columbia who perform work as described in Article 1, Section 1 of this Agreement, and if a majority of the employees at the building in question demonstrate their desire to be represented by the Union, then the terms and conditions of this Agreement shall apply to the employees employed at that building, subject to the provisions of Appendix A.

## ARTICLE 25
## SUCCESSORSHIP/AND NEW ACQUISITIONS

Section 1.  The Employer will furnish the Union notice of termination of any of its cleaning contracts no later than ten (10) days prior to the expiration of that contract or immediately if the Employer is notified less than ten (10) days and thereafter meet with the Union to discuss the effect of such termination of bargaining unit employees.

Section 2.  The Employer agrees to notify the Union of any new locations within the District of Columbia it acquires employing employees covered by this Agreement ten (10) days prior to the start of that cleaning contract.

Section 3.  The Employer agrees to notify the Union if it acquires any new previously unrepresented location within the District of Columbia 10 days prior to the start of that cleaning contract and to adhere to the procedures of Appendix A.

Section 4.  In the event that an Arbitrator selected in accordance with Article 12 finds that an Employer has failed to comply with Section 3 above, the Arbitrator shall order the Employer to immediately implement Appendix A and, so long as majority support is demonstrated, to implement the wages and benefits of the Agreement retroactively to the first day of the cleaning contract.

Section 5.  The Employer agrees to honor the pay rate of any employee employed as a result of acquiring a location covered by this Agreement whose rate of pay is above the rates listed in Article 2  provided that the employee had been receiving that rate for at least thirty (30) days prior to the hiring or, if less, as the result of a phase-in schedule applicable to that location. The successor Employer can request that adequate payroll records be provided as documentation as to pay rate and length of employment in the location.
The predecessor Employer agrees to co-operate in providing the documentation within five (5) business days if requested.  If the documentation is not provided the successor Employer will be required to pay only the rate required in that location.

## ARTICLE 26
## CHANGE IN EMPLOYERS

Section 1.  When the Employer bids or takes over the servicing of any job location where the present employees are working under the terms of a collective bargaining agreement with this Union, the Employer agrees to contact the Union for the seniority list and offer employment first to the current employees by seniority needed to fill the cleaning contract.

16

The Employer will not reduce the wage rate of any employee hired and will recognize the seniority of the employees hired so employees do not lose benefits due to the change in employer.

## Article 27
## MOST FAVORED EMPLOYER CLAUSE

Section 1. If the Union enters into any Agreement which contains any economic terms more favorable to another employer than those contained in this Agreement which become effective during the term of this Agreement, the Company shall have the right to apply those more favorable terms to employees covered by this Agreement prospectively. The Union agrees to inform the Company immediately upon signing of any agreement with a company or contractor in the event the terms of such agreement are more favorable than those contained in this Agreement.

Section 2. Section 1 shall not apply to any collective bargaining agreement or portions thereof whose terms relate to employees at buildings subject to the Service Contract Act or equivalent law or regulation.

Section 3. This Article shall only apply to the terms and conditions for employment in commercial office buildings within the District of Columbia.

## ARTICLE 28
## REGISTRATION OF CURRENT LOCATIONS

Section 1. The employer shall provide the Union with a list of all locations employing employees covered by this Agreement with ten (10) working days of the execution of this Agreement. The list shall include the names, address, social security number, wage and benefit rates, date of hire, classification and shift hours of each employee by location. Every employee is responsible for keeping the Employer informed of his/her most current address and telephone number. Attempts to reach the employee at the telephone number listed shall constitute proper notice.

## ARTICLE 29
## MAINTENANCE OF CONDITIONS

Nothing in this Agreement shall be construed to allow for the reduction of any rate or benefit currently enjoyed by an individual employee.

## ARTICLE 30
## SAVING CLAUSE

Section 1. Should any court find any part of this Agreement to be invalid, it shall not invalidate the remaining provisions.

**ARTICLE 31**
**DURATION**

This Agreement shall become effective at 12:01 am May 1st, 2003 and shall continue in full force and effect through midnight April 30, 2008. Thereafter, it shall automatically renew itself and continue in full force and effect from year to year unless written notice of election to terminate or modify any provision of this Agreement is given by one party to the other party no more than 90 days and no less than 60 days prior to April 30, 2008, or each successive anniversary date.

19

## RECOGNITION PROCEDURE
## APPENDIX A

Local 82, SEIU ("the Union") and_____ the Employer hereby agree to implement the Collective Bargaining Agreement which is annexed hereto, during its specified term, or except as the parties otherwise agree in writing as follows:

1.    The Employer will take a positive approach to the unionization of its non-supervisory janitorial and maintenance employees.  The Employer (and its supervisors) will not take any action or make any statement that will directly or indirectly state or imply any opposition by the Employer to the selection by such employees of a collective bargaining agent, or preference or opposition to any particular union as a bargaining agent.

2.    The Union and its representatives will not coerce or threaten any employee of the Employer in an effort to obtain authorization cards.  In addition, the Union will not engage in strikes, work stoppages, slowdowns or similar forms of interference of work against (The Employer) in conjunction with its organizing efforts of the Employer's employees except, in connection with paragraph 8 of this procedure, after the arbitrator issues an award finding a violation, or if the dispute is not resolved, within twenty (20) days after selection of the arbitrator whichever shall come first.

3.    Upon the Union's request, the Employer will provide within five (5) days a list of the names and addresses of all employees within classifications subject to this Collective Bargaining Agreement, presently employed at a particular job site or sites in the District of Columbia.

4.    Upon notice to the Employer, the Employer will grant the Union access at the job site, provided there is no interference with the conduct of the Employer's business or with the performance of work by the employees during their work hours.  Said access shall include the right to post notices on designated company bulletin boards.

5.    Within seven (7) days following receipt of such notices of intent to organize, a short informational meeting (of approximately 20 minutes duration) for each shift shall be scheduled at the mutual convenience of the Employer and the Union at each affected site, at which the Employer and Union shall jointly address the employees.  At said meeting, the Employer shall inform employees that it has no objection to employees exercising their right to join a union and that there will be no punishment or retaliation against employees who choose to do so.  At said meeting, the Union will be given an opportunity to address the employees, to provide information about the Union and the Collective Bargaining Agreement, and to answer any questions the employees might have.

5.    Immediately following the execution of this Agreement, the Employer shall sign and make available to all of its supervisory and non-supervisory employees, copies of the letter attached hereto, assuring employees of the Employer's neutrality in the matter of their union organizing.

20

7.      Should the Union claim majority status at a building based on signed authorization cards, the parties agree to submit the Union's claim to verification by the Federal Mediation and Conciliation Service (FMCS). The parties shall agree upon a list of employees within the claimed bargaining unit. The parties shall contact the FMCS and agree upon a date for submission of the authorization cards to the FMCS official. On that date, the parties shall provide the agreed upon list of employees, containing names and social security numbers, to the FMCS official. The Union shall submit to the FMCS officials the cards signed by a majority of the employees on the list. The Employer shall submit to the FMCS a copy of an official document (e.g. the employee's application, I-9 or W-4 form) containing the signature for each employee on the agreed upon list. The FMCS shall verify that a majority of the employees on the agreed upon list have authorized the Union to represent them and that the signatures of the employees on the authorization cards match the signatures on the official company documents. In the event of a question as to the signature match, the Employer and the Union agree to provide the original documents to an agreed upon expert for final resolution.  The Employer will not file a petition with the National Labor Relations Board for any election in connection with any demand for recognition by the Union resulting from this Agreement.

8.      The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedite arbitration before an impartial arbitrator.  The decision of the arbitrator shall be final and binding upon the parties.  Should the Employer and the Union be unable to agree upon an impartial arbitrator, the impartial arbitrator shall be chosen from lists of seven (7) submitted by the American Arbitration Association pursuant to its rules for expedited arbitration upon the written request of the Employer or the Union.  A finding or an award of the arbitrator shall be final and conclusive upon the parties.  The parties shall request that the list of seven (7) arbitrators contain only names of individuals familiar with labor law and with experience in the field of arbitration.  It is understood and agreed between the parties that the impartial arbitrator shall not have the power to add to or subtract from, or modify any of the terms of this Agreement.  The fees of the impartial arbitrator and administrative expenses shall be shared equally between the Employer and the Union.  Each party shall pay its own counsel.

## SAMPLE NEUTRALITY LETTER

Dear (Employer's Name) Employees:

As you may know, organizers from the Justice for Janitors Campaign have been talking with employees about forming a union.  We want you to know that you have a right to form, join or support the organizing effort.  We have met with the Union and agreed to remain neutral so you can decide if you want the Union to represent you.  We have instructed all supervisors not to talk to you about the Union.  As has been (Employer's Name) policy, the supervisors will not discipline you, transfer you or discharge you because of your support for the Union.

We have agreed to let the Union post literature on company bulletin boards in our offices in each building, to give the Union access to meet with you before and after work so long as these meetings do not interfere with the performance of your work.

(Employer's Name) is interested in establishing a friendly and productive relationship with the Union and will deal fairly with the Union if you decide you want to be represented.

### Appendix C:  Family Medical and Parental Leave

**Family Medical Leave:**  The District of Columbia Family and Medical Leave Act of 1990, DC Law 8-181, requires effective April 1, 1991, all employers of 20 or more employees in the District of Columbia to provide up to 16 weeks of unpaid family leave:

> *for the birth of a child, adoption or foster care
> *to care for a seriously ill family member

and up to 16 weeks of unpaid medical leave

> *to recover from a serious illness rendering the employee unable to work

for a total of 32 weeks during a 24-month period.

During the period of leave, an employee shall not lose an employment benefit such as seniority or group health plan coverage.

The employer may require medical certification and reasonable prior notice when applicable.

The Act applies to employees who have worked for the employer for one year without a break in service and who have worked at least 1000 hours during the last 12 months.  Employers may have leave policies which are more generous than those required by the Act.  The employee must request FMLA leave.

**Parental Leave**:  The District of Columbia Parental Leave Act of 1994, DC Law 10-146, DC Code 36-1601 et.seq, requires, effective August 17,1994, all employers located in the District of Columbia to provide an eligible employee, with up to 24 hours of leave during a 12 month period for the following purposes:

*To attend or participate in a school-related event for his or her child in which the child is a participant or a subject.

The Act applies to all employees who are parents.  The term "parent" means any of the following: 1). The biological parents of a child 2). A person who has legal custody of a child 3) a person who acts as a guardian of a child regardless of whether he or she had been appointed legally, 4) an aunt, uncle, or grandparent of a child, or 5) the spouse of any of the foregoing persons.

The employee must, when possible, provide the employer with notice of a request for leave within 10 calendar days from the day of the event.

During the period of leave, an employee shall not lose any employment benefit or seniority accrued before or during the time of leave.

The leave provided by the act may be unpaid leave unless the employee elects to use any paid family, vacation, personal, compensatory, or leave bank leave provided by the employer.

The leave requested may only be denied if it would disrupt the employer's business and make achievement of production or service delivery unusually difficult.

---

*Side Letter*
*Agreed to 12/21/97*

This Side Letter shall be a part of the current Collective Bargaining Agreement between SEIU Local 82 and the District of Columbia Commercial Office Building Cleaning Contractors.

The purpose of this Side Letter is to clarify the classification difference between Full Time Cleaners who may work during the day and Day Porters under the current Collective Bargaining Agreement that is attached.

For purposes of classification work, the parties agree that a Day Porter's primary work may include some or all of the following: policing outside ground, light maintenance, (ie light bulb changes, etc.), responding to tenant/building management requests and some form of security/front desk duties. A Day Porter may have some cleaning responsibilities as assigned from time to time. However, they would not correspond to a Full Time Cleaner who has a regularly assigned area (ie. The third floor) or task (ie bathrooms, pulling trash, etc.). Full Time Cleaners typically would not work under the direction of building management nor respond directly to tenant requests.

**APPENDIX B**
**OVERSCALE LOCATIONS**

The following is the list of over-scale buildings and the rate effective on that date.  All other increases shall be as specified in Article 2 of the Agreement

**Building Address**

**8000 Corp. Dr**

|  | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|---|
| Wages, PT | $8.75 | $9.15 | $9.55 | $10.00 | $10.45 |
| Wages, Lead | $9.80 | $10.20 | $10.60 | $11.05 | $11.50 |
| Holidays | + All holidays recognized by the building | | | | |

**1625 L St., NW**     (AFSCME)

|  | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|---|
| Wages, PT | $9.75 | $10.15 | $10.55 | $11.00 | $11.45 |
| Wages, Floor | $10.00 | $10.40 | $10.80 | $11.25 | $11.70 |
| Holidays | + All holidays recognized by the building | | | | |
| Sick Days | 12/year | | | | |

**NEA**

|  | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|---|
| Wages, cleaners | $9.10 | $9.50 | $9.90 | $10.35 | $10.80 |
| Wages, DP | $9.35 | $9.75 | $10.15 | $10.60 | $11.05 |
| Wages, Lead Day | + .25/hr | | | | |
| Holidays | + Day after Thanksgiving, Columbus Day, Veteran's Day | | | | |

**1219 28th St., NW (HERE)**

|  | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|---|
| Wages, PT | 10.30 | $10.70 | 11.10 | $11.55 | 12.00 |
| Wages, FT | $10.55 | $10.95 | $11.35 | $11.80 | $12.25 |
| Wages, Lead | + .25/hour | | | | |
| Holidays | + Columbus Day, Veteran's Day | | | | |

24

**111 Mass (Ullico)**

|                      | 1/1/04 | 1/1/05  | 1/1/06  | 1/1/07  | 1/1/08  |
|----------------------|--------|---------|---------|---------|---------|
| Wages, PT            | 9.25   | $9.65   | $10.05  | $10.50  | $10.95  |
| Wages, FT            | $9.55  | $9.95   | $10.35  | $10.80  | $11.25  |
| Wages, Waxer/Buffer  | + .10/hr |       |         |         |         |
| Wages, Lead          | + .20/hour |     |         |         |         |
| Wages, Porter        | $9.55  | $9.95   | $10.35  | $10.80  | $11.25  |
| Holidays             | + Columbus Day, Veteran's Day, Employees Birthday | | | | |
| Sick Days            | 12/year |        |         |         |         |
| Vacation             | 4 weeks after 7 years | | | | |
| Other                | Jury Duty Pay, 2 hrs paid travel time in inclement weather | | | | |

**1120 19th, NW**

| Holidays | + Columbus Day, Veteran's Day |
|----------|-------------------------------|

**1001 Penn. Ave., NW**

|           | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|-----------|--------|--------|--------|--------|--------|
| Wages, FT | $9.25  | $9.65  | $10.05 | $10.50 | $10.95 |

**1717 Desales**

|           | 1/1/04  | 1/1/05  | 1/1/06  | 1/1/07  | 1/1/08  |
|-----------|---------|---------|---------|---------|---------|
| Wages, Pt | $9.25   | $9.65   | $10.05  | $10.50  | $10.95  |
| Wages, FT | $9.70   | $10.10  | $10.50  | $10.95  | $11.40  |
| Wages, DP | $10.05  | $10.45  | $10.85  | $11.30  | $11.75  |

**501 3rd St., NW**

|           | 1/1/04  | 1/1/05  | 1/1/06  | 1/1/07  | 1/1/08  |
|-----------|---------|---------|---------|---------|---------|
| Wages, Pt | $11.30  | $11.70  | $12.10  | $12.55  | $13.00  |
| Holidays  | + Veteran's Day, Columbus Day, Day After Thanksgiving, Inauguration Day | | | | |
| Sick Days | 12/year |         |         |         |         |
| Vacation  | 4 weeks after 12 years, 5 weeks after 20 years | | | | |

**1125 15th St., NW**

|           | 1/1/04  | 1/1/05  | 1/1/06  | 1/1/07  | 1/1/08  |
|-----------|---------|---------|---------|---------|---------|
| Wages, PT | 10.00   | $10.40  | $10.80  | $11.25  | $11.70  |
| Holidays  | + Columbus Day, Inauguration Day | | | | |
| Sick Days | 12/year |         |         |         |         |
| Vacation  | 4 weeks after 10 years | | | | |

**1625 Mass., NW**

|           | 1/1/04  | 1/1/05  | 1/1/06  | 1/1/07  | 1/1/08  |
|-----------|---------|---------|---------|---------|---------|
| Wages, Pt | $9.00   | $9.40   | $9.80   | $10.25  | $10.70  |
| Holidays  | + Columbus Day, Veteran's Day, Day after Thanksgiving, Inauguration Day | | | | |

25

**1900 L St., NW**

|  | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|---|
| Wages, PT | $9.16 | $9.56 | $9.96 | $10.41 | $10.86 |
| Holidays | + Columbus Day, Veteran's Day | | | | |

**1750 Pa, NW**

|  | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|---|
| Wages, PT | $9.00 | $9.40 | $9.80 | $10.25 | $10.70 |

**5025 Wisconsin Ave., NW**

|  | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|---|
| Wages, PT | 8.55 | $8.95 | $9.35 | $9.80 | $10.25 |
| Holidays | + Presidents Day, Veterans Day, Columbus Day | | | | |

**1775 K St., NW (Suffridge Bldg)**

|  | 1/1/04 | 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 |
|---|---|---|---|---|---|
| Wages, Night | $10.55 | $10.95 | $11.35 | $11.80 | $12.25 |
| Day | $10.80 | $11.20 | $11.60 | $12.05 | $12.50 |

Holidays:     +Presidents Day, Veterans Day, Columbus Day, Inauguration Day
H&W:     $0.29/hour paid for all Night Workers
        $0.44/hour paid for all Day Workers
Vacation:     1 wk after 6 months; 2 wks after one year; 3 weeks after 5 years; 4 wks after 10 yrs
Sick Leave:     12 days per year earned at the rate of one (1) day per month. 36 days can be accrued
Lay-off:     Two weeks notice or two weeks pay.
Life Ins:     All regular employees shall be provided with a $5,000 life insurance policy.
Jury Duty:     All full time employees shall be paid the difference between their straight time hourly rate for regularly scheduled hours and the payment he receives from the Court.
Funeral:     Three days with pay to attend the funeral of a spouse, father, mother, son, daughter, brother, sister, grandparents, grandchildren or mother/father-in-law.

**1925 K St., Mercury Building**

Wages,     per Article 2
Lead     per Article 2
Holidays:     Birthday, Veteran's Day, Inauguration Day, Columbus Day and a floating day of with pay.
Vacation:     Twelve (12) years of employment, four weeks of paid vacation
Sick Days:     Twelve (12) paid sick days per year, earned at the rate of one day per month
H&S:     The employer shall provide reasonable and adequate locker facilities
Uniforms:     The employer agrees to furnish uniforms and pay dry-cleaning costs if necessary

**1550 M St.,**

|          | 1/1/04  | 1/1/05  | 1/1/06  | 1/1/07  | 1/1/08  |
|----------|---------|---------|---------|---------|---------|
| Wages, Pt | $10.32 | $10.72 | $11.12 | $11.57 | $12.02 |

Holidays    + Employee Birthday, Day after Thanksgiving, Inauguration Day
Vacation:   4 weeks after 10 years, 5 weeks after 20 years
Sick Days   12 days per year earned at the rate of 1 day per month

**3211 4th Street, NW National Conference of Catholic Bishops**

|          | 1/1/04  | 1/1/05  | 1/1/06  | 1/1/07  | 1/1/08  |
|----------|---------|---------|---------|---------|---------|
| Wages PT | $9.00   | $9.40   | $9.80   | $10.25  | $10.70  |
| Wages FT | $9.89   | $10.29  | $10.69  | $11.14  | $11.59  |

Holidays    + Martin Luther Kings Day, Presidents' Day, Columbus Day, Veterans

Any employee required to work on any of the holidays listed above shall be paid at the rate of double time.

**Ronald Reagan & International Trade Center Building**
**1300 Pennsylvania Ave, NW**

**Classification Houseman**

|       | 1/1/03  | 1/1/04  | 1/1/05  | 1/1/06  | 1/1/07  | 1/1/08  |
|-------|---------|---------|---------|---------|---------|---------|
| Wages | $12.05  | $12.55  | $12.95  | $13.35  | $13.80  | $14.25  |

Housemen are required to do the following:

Continue to put tablecloths on the tables

Climbing of foot ladder, Housemen will be required to usage of no heights greater than nine (9) feet. For usage of the standard lift, Housemen can be required at heights greater than nine (9) feet.

Both parties, the Union and contractor agree to monthly labor/management meets to discuss outstanding issues if necessary